## STATE OF CONNECTICUT *v.* GERALDINE E. PUTNOKI
## (12567)

PETERS, C. J., SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued April 30—decision released June 17, 1986

*Thomas C. White,* for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, with whom were *James G. Clark,* deputy assistant state's attorney, and, on the brief, *John J. Kelly,* chief state's attorney, for the appellee (state).

PETERS, C. J. This case principally concerns the proper interpretation and application of General Statutes (Rev. to 1983) § 53a-47,[1] which governed the con-

---

[1] At the time of the defendant's arrest and arraignment, General Statutes (Rev. to 1983) § 53a-47 provided in relevant part: "DISPOSITION OF PERSON FOUND GUILTY BUT NOT CRIMINALLY RESPONSIBLE BECAUSE OF MENTAL DISEASE OR DEFECT. CONFINEMENT AND EXAMINATION. RELEASE. (a) (1) When any person charged with an offense is found guilty but not criminally responsible on the grounds of mental disease or defect, the court shall order such person to be temporarily confined in any of the state hospitals for mental illness for a reasonable time, not to exceed ninety days, for an examination to determine his mental condition, except that, if the court can determine on the basis of the evidence already before it, that such person is not mentally ill to the extent that his release would constitute a danger to himself or others, the court may order his immediate release, either unconditionally or conditionally pursuant to subsection (f). (2) The person to be examined shall be informed that, in addition to the examination provided for in subdivision (1), he has a right to be examined during such confinement by a psychiatrist of his own choice. (3) Within sixty days of the confinement pursuant to subdivision (1), the superintendent of such hospital and the retained psychiatrist, if any, shall file reports with the court setting forth their findings and conclusions as to whether such person is mentally ill to the extent that his release would constitute a danger to himself or others. Copies of such reports shall be delivered to the state's attorney or prosecutor and to counsel for such person. (4) Upon receipt of such reports, the court shall promptly schedule a hearing. If the court determines that the preponderance of the evidence at the hearing establishes that such person is mentally ill to the extent that his release would constitute a danger to himself or others, the court shall confine such person in a suitable hospital or other treatment facility.

"(b) Whenever a person is committed for confinement pursuant to subdivision (4) of subsection (a), his confinement shall continue until he is no

finement, evaluation, and release of individuals who have been found guilty of an offense, but not criminally

longer mentally ill to the extent that his release would constitute a danger to himself or others, provided the total period of confinement, except as provided in subsection (d), shall not exceed a maximum term fixed by the court at the time of confinement, which maximum term shall not exceed the maximum sentence which could have been imposed if the person had been convicted of the offense. Where the offense is a class A felony, such maximum term shall be twenty-five years.

"(c) (1) Upon certification by the superintendent of the hospital or institution that, in his opinion, such person is no longer mentally ill to the extent that his release would constitute a danger to himself or others, the court may order the release of the person confined at the expiration of thirty days from the time such certificate is filed. (2) At the time such certificate is filed with the court, a copy shall be furnished to the state's attorney or prosecutor who may request a hearing as to whether such person should be released. At such hearing, evidence of mental condition may be submitted. The confined person shall be released unless the state establishes by a preponderance of the evidence that such person is, at the time of hearing, mentally ill to the extent that his release would constitute a danger to himself or others. (3) The superintendent shall, during such confinement, submit to the court at least every six months a written report with respect to the mental condition of such person. Copies of such report shall be furnished to the state's attorney or prosecutor and counsel for the confined person. The court, upon its own motion or at the request of the parties, may at any time hold a hearing to determine whether such person should be released prior to the expiration of the maximum period, in accordance with the standards set forth in subdivision (1), provided such a hearing shall be held at least every five years.

"(d) At the expiration of such maximum period the superintendent of such hospital or institution shall, if the person is still confined there, release him, unless the following procedure for an order of continued confinement has been instituted. At any time within ninety days prior to such expiration, the state's attorney or assistant state's attorney for the judicial district in which the person was tried, or in which the circuit or geographical area is located if such person was tried in the circuit court or the court of common pleas, may petition the court for an order of further confinement on the grounds that release of the person would constitute a danger to life or person. The court shall thereupon hold a prompt hearing, after due notice to the person confined. At such hearing the state shall have the burden of proving by a preponderance of the evidence that such person's continued confinement is warranted because he is mentally ill to the extent that his release would constitute a danger to life or person. If the court so finds, the court shall order the continued confinement of the person until such time as it is determined that his release would not constitute a danger to life or person; provided the provisions of subsections (c) and (e) shall be applicable to persons so confined.

responsible because of mental disease or defect.[2] The defendant, Geraldine Putnoki, was found guilty of, but not criminally responsible for, manslaughter in the first degree and was ordered placed in the custody of the commissioner of mental health for twelve years. The defendant appeals from the order of confinement.

The underlying facts are undisputed. On March 21, 1983, while pregnant with her third child, the defendant stabbed her mother-in-law to death. Following a psychiatric examination of the defendant, the trial court found the defendant incompetent to stand trial on May 26, 1983. On November 7, 1983, a competency

"(e) In each of the hearings provided for in this section the mentally ill person shall have a right to be present, to be represented by counsel and to present evidence. If he fails or refuses to obtain counsel, the court shall appoint counsel to represent him. Such person may call a psychiatrist to examine him and testify at any such hearing. The participation of such psychiatrist shall be at the confined person's expense unless he is financially unable to retain one, in which case the court shall assist him in obtaining a psychiatrist's services at the expense of the state.

"(f) The court may order that a person released pursuant to this section be released under such conditions and supervision as the court deems appropriate to his situation, which may include treatment on an outpatient basis, the taking of medication or supervision by the office of adult probation for a period not to exceed the maximum term provided in subsection (b) of this section."

Although this statute had been amended prior to the defendant's hearing, the court applied this version, which had been in effect at the time of the defendant's arrest and arraignment.

[2] Prior to 1981, a criminal defendant who prevailed on an insanity defense was deemed to be "acquitted on the grounds of mental disease or defect." Public Acts 1981, No. 81-301, § 2, changed this standard to "guilty but not criminally responsible on the grounds of mental disease or defect." This standard was changed again in 1983 to its present form, "not guilty by reason of mental disease or defect," by Public Acts 1983, No. 83-486, § 2. This public act also shifted the burden of proof in a § 53a-47 hearing from the state to the defendant to establish by a preponderance of the evidence that he is not mentally ill to the extent that his release would constitute a danger to himself or others. This change became effective on October 1, 1983, prior to the defendant's hearing but after formal proceedings had been instituted against her. Accordingly, all parties proceeded under the previous version of the statute which placed the burden of proof on the state.

hearing was held at which the defendant's treating psychiatrist at Fairfield Hills State Hospital testified that, although the defendant required further inpatient treatment, she was able to prepare for trial and to assist in her own defense. The trial court accordingly found her competent to stand trial, but ordered the defendant to remain in Fairfield Hills Hospital as an inpatient. On April 27, 1984, following a trial to the court, the defendant was found guilty of, but not criminally responsible for, the killing of her mother-in-law. In accordance with the procedures outlined in § 53a-47 (a) (1), the trial court then ordered the defendant temporarily committed to Fairfield Hills Hospital for an examination to determine her mental condition.

In June of 1984, two psychiatrists submitted reports to the court. Dr. W. Fernando, the defendant's treating psychiatrist at Fairfield Hills Hospital, reported that the defendant "has a biological predisposition to suffer from recurrent depression of psychotic [proportions] under severe stress," and "a vulnerability to become depressed and possibly psychotic during periods of stress." He concluded that, in his opinion, the defendant could be released from the hospital with "minimal" danger to herself or to others *if* she received "appropriate psychiatric care which should consist of outpatient chemotherapy, psychotherapy, family therapy, [and] probation for a stipulated period of time."

A second psychiatrist, Dr. Jeremy August, who had examined the defendant several times at her request, reported that the defendant's mental illness was currently in remission, although she would "[m]ost likely . . . at some point in the future suffer a relapse of her depressive illness, with or without psychotic symptoms." He concluded that in her present "compensated state" she did not present a danger to herself or to others, but, noting abnormalities on her EEG (electroencephalogram), recommended that she continue to

take her prescribed medications and even suggested that an additional anticonvulsant drug be prescribed.

Following receipt of these reports, the trial court held a formal hearing pursuant to § 53a-47 (a) (4). Both psychiatrists testified at this hearing, as did the defendant's husband. Dr. Fernando testified that, as an inpatient, the defendant was daily taking both Ludiomil, an antidepressant drug, "to prevent her from lapsing into depression," and Haldol, an antipsychotic drug, "to prevent her from relapsing into psychosis," and was also receiving both individual and group psychotherapy. He stated that, although there was no cure for her illness, the medication she was receiving "corrects the chemical imbalance which is responsible for the symptoms . . . and thereby improves [her] inside judgment, orientation, memory and all the aspects of thinking and functioning." He reiterated his opinion that the defendant's release would pose only a "minimal" risk of danger to herself or to others as long as she continued to receive her prescribed medication and therapy, but that she might be dangerous if such treatment were discontinued.

Dr. August testified that "where [the defendant] is not depressed and psychotic, she is not a violent person . . . [but] [w]hen she is crazy, I think anything goes." He stated that, in his opinion, she was no longer mentally ill and that he "wouldn't be surprised" if she no longer needed medication. He concluded that she was "low on the list of potentially dangerous persons," and believed that she could be released without danger to herself or to others.

At the end of the hearing, the trial court ruled that the state had sustained its burden of establishing by a preponderance of the evidence that the defendant was "potentially a danger to herself or others at the present time." In reaching this conclusion, the court focused

on testimony that the defendant was being kept "in a locked ward" at the hospital and was "continually under medication," and that "no attempt [had been made] to take her off medication and see what the reaction [would be]." The court noted that Dr. Fernando's stated opinion that the defendant's release would constitute only a minimal danger was expressly conditioned on her continuing to receive "appropriate chemotherapy, psychotherapy, family therapy and [to] be on probation for a stipulated period of time." Concluding that § 53a-47 (a) (4) prohibited the imposition of conditions upon release but instead required either unconditional release or further confinement, the court ordered the defendant confined to Fairfield Hills Hospital for a maximum of twelve years or until release was determined to be warranted under the ongoing review provisions contained in § 53a-47 (c).[3]

In appealing from the order of confinement, the defendant claims that the trial court erred: (1) in interpreting § 53a-47 to prohibit conditional release from confinement; (2) in concluding that the state had established by a preponderance of the evidence that the defendant was mentally ill to the extent that her release would constitute a danger to herself or to others; and (3) in certain evidentiary rulings.[4] We find error and remand for a new hearing.

---

[3] At the time of the hearing, General Statutes § 53a-47 (c) provided for periodic review of the mental condition of anyone confined pursuant to § 53a-47, and also gave such person the right to request a hearing at any time to determine whether he should be released. Counsel for the defendant stated at oral argument before this court that the defendant has neither requested nor received such a hearing subsequent to the July, 1984 hearing at issue in this case.

[4] The defendant claims that the trial court erred in excluding both testimony of the defendant's husband concerning his wishes for his wife's release and letters submitted to the court in support of the husband's character. The defendant offered both the testimony and the letters in an attempt to establish that her husband would be supportive of the defendant if she were released, claiming that this evidence "would tend to be probative of

The defendant initially claims that the trial court's interpretation of § 53a-47 to prohibit conditional release was erroneous. During her presentation of evidence at the July, 1984 hearing and again during closing arguments to the court, the defendant argued that § 53a-47 (f) gave the trial court the option of releasing the defendant under appropriate conditions. The trial court disagreed, ruling that although § 53a-47 (a) (1) expressly authorized the court to order a conditional release immediately after trial, § 53a-47 (a) (4) did not provide the court with a similar option at a hearing following confinement for evaluation. Consequently, the trial court refused both to permit the defendant to introduce any evidence relevant to a conditional release or to consider such an option in evaluating the advisability of releasing the defendant from confinement.

Our resolution of the issue before us requires us to examine the language of subsection (f) of § 53a-47, which authorized conditional release, and then to determine its applicability to subsection (a), which established procedures for the evaluation, confinement, and release of a person who has been adjudged guilty of, but not criminally responsible for, an offense because of mental illness or defect. In doing so, we are mindful that "[t]he fundamental objective of statutory construction is to ascertain and give effect to the apparent intent

continuing supervision and care of her, if that should be required." The trial court sustained the state's objection to this evidence on relevancy grounds, stating that, since the court was without authority to order the defendant's release with conditions, such evidence was irrelevant to the proceedings. Since we decide today that the trial court had the authority to impose conditions on the defendant's release, the exclusion of the evidence, for that reason at least, was erroneous.

The defendant also claims error in the trial court's exclusion of a treatment plan drawn up by the defendant's psychiatrists at Fairfield Hills Hospital. We decline to review this claim on appeal because the defendant failed to take an exception to the trial court's ruling, as required by Practice Book § 288. See *Deer Island Assn.* v. *Trolle,* 181 Conn. 201, 203–204, 435 A.2d 10 (1980).

of the legislature." *State* v. *Kozlowski,* 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith,* 194 Conn. 52, 57, 480 A.2d 425 (1984); 2A Sutherland, Statutory Construction (4th Ed. Sands 1984) § 45.05.

Our examination of the relevant language of § 53a-47 convinces us that subsection (f) permitted a trial court, in its discretion, to order a conditional release from confinement *whenever* it determined that release under this statute was appropriate, regardless of the stage in the proceedings at which the release was to occur. In reaching the opposite conclusion, the trial court focused exclusively on the contrast between the express reference to the conditional release option contained in subsection (a) (1) and the absence of such a reference in subsection (a) (4). Although, standing alone, such an inconsistency may signal a legislative intent to permit conditional release in the former instance while prohibiting it in the latter, we believe that such a construction is foreclosed by the plain language of subsection (f) itself. See *Mazur* v. *Blum,* 184 Conn. 116, 118–19, 441 A.2d 65 (1981). That subsection provided that "[t]he court may order that a person released pursuant to *this section* be released under such conditions and supervision as the court deems appropriate to his situation . . . ." (Emphasis added.) It is apparent from a review of the statute in its entirety that the words "this section" contained in subsection (f) referred to section 53a-47 as a whole, and not to any particular subsection. Significantly, there was *no* statutory language which expressly limited the application of this conditional release option to one particular stage of the proceedings to the exclusion of any other stage. The unqualified wording of subsection (f), therefore, compels the conclusion that the legislature intended to vest the trial court with the discretion to order conditional release from confinement whenever it contemplated a release under § 53a-47.

This interpretation is strengthened by the legislative history of Public Acts 1981, No. 81-301, § 2, which amended § 53a-47 to list explicitly a number of conditions available to a trial court considering the release of an individual under this statute.[5] Speaking in support of this amendment on the Senate floor, Senator Howard T. Owens, Jr., stated: "The defendants, under existing law, who are acquitted on the grounds of insanity, must be temporarily committed for psychiatric evaluation and then the court determines what has to be done *after that.* This Bill specifies that the court may require [some] of these options and it sets forth [that] these are out-patient treatment . . . and so forth." (Emphasis added.) 24 S. Proc., Pt. 7, 1981 Sess., pp. 2412-13. There is nothing in these remarks or in any part of the history of the amendment to suggest an intent to limit the applicability of these options to the period immediately posttrial. On the contrary, the legislature intended to *expand* the options available to a trial court whenever it was faced with the difficult task of deciding whether to release a person who has been adjudged guilty of, but not criminally responsible for, an offense.

Accordingly, in the face of this expression of legislative intent, we hold that a trial court was vested with authority under subsection (f) to impose conditions on any release ordered pursuant to § 53a-47. The trial court therefore erred in concluding to the contrary and in failing to consider the possibility of a release with

[5] Public Acts 1981, No. 81-301, provides in relevant part: "Sec. 2. Section 53a-47 of the general statutes is repealed and the following is substituted in lieu thereof . . . . (f) The court may order that [such] a person released pursuant to this section be released under such conditions and supervision as the court deems appropriate to his situation, which may include treatment on an outpatient basis, the taking of medication or supervision by the office of adult probation for a period not to exceed the maximum term provided in subsection (b) of this section."

conditions when it weighed its available options relative to its disposition of the defendant's case.

It is apparent from the record of the trial court proceedings that the court's underlying determination of the defendant's dangerousness was colored by its erroneous reading of § 53a-47 to prevent the imposition of conditions upon release. Both the transcript of the July hearing and the memorandum of decision which followed suggest that the court believed that the defendant constituted a danger to herself or to others if she failed to receive her prescribed medication, therapy, and supervision. See *State* v. *Warren,* 169 Conn. 207, 211–14, 363 A.2d 91 (1975). In making its ultimate finding of dangerousness, the court referred specifically to medical testimony recommending continued medication and therapy, and concluded, "[c]ertainly *without supervision* to insure that the recommendations of Dr. Fernando are carried out, the risk of unsupervised release at this time would not be justified." (Emphasis added.) Because of the court's erroneous belief that its only available options were either to release the defendant unconditionally or to find her dangerous and order her confined in a mental hospital, it chose the latter.

We have no way of knowing what the court would have concluded had it correctly interpreted its statutory authority to impose conditions upon release. Consequently, because the trial court's ultimate finding of dangerousness was tainted by its erroneous interpretation of the statutory standard under which it was operating, we vacate the original finding and remand for a new hearing.

The defendant, however, while agreeing that the original finding of dangerousness should be vacated, argues that the trial court is now foreclosed from reconsidering the question of her mental status because the

evidence presented at the original hearing was insufficient to establish either that she was mentally ill or that her release would constitute a danger.[6] The crux of the defendant's claim in this regard is that neither of the two testifying psychiatrists stated unequivocally that she was mentally ill or that there was a reasonable probability that she would pose a danger if released. Implicit in this argument are two assumptions: that the determination of dangerousness is a medical rather than a legal decision, and that the trial court was bound by the testimony and conclusions of the psychiatrists. Both assumptions are incorrect.

Although a trial court may choose to attach special weight to the testimony of medical experts at a hearing to determine mental status, the ultimate determination of mental illness and dangerousness is a legal decision. *DeVeau* v. *United States,* 483 A.2d 307, 312 (D.C. App. 1984); *State* v. *Paradis,* 123 N.H. 68, 71, 455 A.2d 1070 (1983); *State* v. *Krol,* 68 N.J. 236, 261, 344 A.2d 289 (1975); American Psychiatric Association, Clinical Aspects of the Violent Individual, Task Force Report 8, pp. 26, 33 (July, 1974); Katz, "The Right to Treatment—An Enchanting Legal Fiction," 36 U. Chi. L. Rev. 755, 765 (1969). Partly because definitions of dangerousness are necessarily vague; Cocozza & Steadman, "The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence," 29 Rutgers L. Rev. 1084, 1085 (1976); and partly because there are no "psychological or physical signs or symptoms which can be reliably used to discriminate between the potentially dangerous and the harmless individual"; Diamond, "The Psychiatric Prediction of Dangerousness," 123 U. Pa. L. Rev. 439, 444 (1974); psychiatric

---

[6] The state concurs with the defendant that the evidence was insufficient to support the trial court's finding. We are not, however, bound by the state's concession. *State* v. *Avery,* 199 Conn. 377, 379 n.2, 507 A.2d 464 (1986).

predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable. Stone, Law, Psychiatry and Morality (1984) pp. 107–108, 170 (1984); Slobogin, "Dangerousness and Expertise," 133 U. Pa. L. Rev. 97, 110–17 (1985); Cocozza & Steadman, supra, 1085, 1097–98; Diamond, supra, 451. Consequently, both the American Psychiatric Association; see American Psychiatric Association, Clinical Aspects of the Violent Individual, supra, pp. 26, 33; Stone, supra, 107–108; Cocozza & Steadman, supra, 1100; and the American Bar Association; see American Bar Association, Proposed Criminal Justice Mental Health Standards (First Tentative Draft, July, 1983) Standard 7-3.9 (b); have cautioned against the unfettered reliance in the criminal justice context on expert psychiatric predictions of future dangerousness as a predicate to the release from confinement of persons who have been adjudged guilty of, but not criminally responsible for, a criminal offense.[7]

In addition, the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. *DeVeau* v. *United States,* supra, 312; Stone, supra, 140–41. While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already

---

[7] The proposed § 7-3.9 (b) of the American Bar Association Criminal Justice Mental Health Standards (First Tentative Draft, July, 1983) would go even further and make expert opinion of future dangerousness inadmissible: "Standard 7-3.9. ADMISSIBILITY OF EXPERT TESTIMONY CONCERNING A PERSON'S MENTAL CONDITION OR BEHAVIOR . . . . (b) Admissibility of expert testimony concerning a person's future mental condition or behavior. An expert opinion stating a conclusion that a particular person will or will not engage in dangerous behavior in the future should not be admissible in any criminal proceeding or in any special commitment hearing involving a person found not responsible under the criminal law."

shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. *State* v. *Paradis,* supra, 71; *State* v. *Krol,* supra, 261; see American Psychiatric Association, Clinical Aspects of the Violent Individual, supra, p. 26. The "awesome task" of weighing these two interests and arriving at a decision concerning release rests finally with the trial court. *Dixon* v. *Jacobs,* 427 F.2d 589, 600 (D.C. Cir. 1970).

Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. *Seymour* v. *Seymour,* 180 Conn. 705, 712, 433 A.2d 1005 (1980); *DeVeau* v. *United States,* supra, 315–16; *In re Fleming,* 431 A.2d 616, 618 (Me. 1981); *State* v. *Paradis,* supra, 71; *State* v. *Krol,* supra, 261. It may, in its discretion, accept all, part, or none of the experts' testimony. *Johnson* v. *Fuller,* 190 Conn. 552, 556, 461 A.2d 988 (1983); *Smith* v. *Smith,* 183 Conn. 121, 123, 438 A.2d 842 (1981); *Seymour* v. *Seymour,* supra, 712. In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released. *State* v. *Cuvelier,* 175 Conn. 100, 109, 394 A.2d 185 (1978); *DeVeau* v. *United States,* supra, 314–15; *Taylor* v. *Commissioner of Mental Health,* 481 A.2d 139, 146–47 (Me. 1984); *State* v. *Krol,* supra, 261.

An examination of the record in the present case reveals that there was ample evidence from which the

trial court could reasonably have concluded that the defendant was mentally ill to the extent that her release without continued medication and therapy would constitute a danger to herself or to others. The defendant's treating psychiatrist testified that, although there was no actual "cure" for her depression and psychosis, the medication she was receiving had been successful in correcting the underlying "chemical imbalance which [was] responsible for the symptoms." He repeatedly conditioned his recommendation that she be released on her continued receipt of her prescribed medication, psychotherapy, and supervision, stating that if these conditions were observed, the likelihood of her becoming violent was "minimal." He stated, however, that if she stopped taking her medication she might become dangerous, although he considered this unlikely.

The fact that neither psychiatrist testified that it was "probable" that the defendant would become dangerous without continued treatment and medication did not, as the defendant argues, prevent the trial court from reaching a different conclusion. The court was aware that, slightly more than a year earlier, the defendant had committed an extremely violent act in stabbing to death her invalid mother-in-law. It was aware also that, in the intervening period, she had been an inpatient in a "locked ward" at a mental hospital, under continual supervision and receiving daily doses of antidepressant and antipsychotic drugs, and that her doctor's recommendation for her release was premised on her receiving continued treatment. Under these circumstances, it was not unreasonable for the trial court to have concluded that it was more probable than not that the defendant's progress was dependent on her medication and therapy, and that the risk of a violent relapse upon release without medication or supervision was too great to take. See *State* v. *Warren,* supra,

211–14. The evidence presented was therefore sufficient to support the finding, and the trial court is accordingly not foreclosed from again considering the defendant's mental condition upon remand.

In the new hearing which must be held, it will of course be necessary for the trial court to base its decision as to the advisability of the defendant's discharge on an examination of her *present* mental condition. See *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 80, 454 A.2d 1262 (1983); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 675–76, 420 A.2d 875 (1979); *Taylor* v. *Commissioner of Mental Health*, supra, 155; *State* v. *Krol*, supra, 266. An individual's mental and emotional status does not remain static but responds to numerous external and internal forces. If the court determines that it should order the defendant's continued confinement or her conditional release subject to court supervision, any further proceedings with regard to the defendant's mental condition will be governed by Public Acts 1985, No. 85-506. See Public Acts 1985, No. 85-506, § 23.

There is error, the judgment is vacated and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.