## STATE OF CONNECTICUT *v.* DAWN MARCH
### (SC 16776)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued December 3, 2002—officially released September 9, 2003

*Richard E. Condon, Jr.*, assistant public defender, with whom, on the brief, was *Monte P. Radler*, public defender, for the appellant (defendant).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, was *Frank S. Maco*, state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Dawn March, who was acquitted of a manslaughter charge because of mental disease or defect pursuant to General Statutes

§ 53a-13 (a),[1] appeals[2] from the trial court's judgment denying her application for discharge from the jurisdiction of the psychiatric security review board (board) filed pursuant to General Statutes § 17a-593 (a).[3] The defendant claims that the trial court improperly: (1) failed to apply the civil commitment standards for defining mental illness and dangerousness as set forth in General Statutes § 17a-495[4] in determining whether the defendant was a person with "psychiatric disabilities" who posed "a danger to herself or others"; (2) found

---

[1] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[2] The defendant filed her appeal with the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] General Statutes § 17a-593 (a) provides: "The board, pursuant to section 17a-584 or 17a-592, may recommend to the court the discharge of the acquittee from custody or the acquittee may apply directly to the court for discharge from custody. The court shall send copies of the recommendation or application to the state's attorney and to counsel for the acquittee. An acquittee may apply for discharge not more than once every six months and no sooner than six months after the initial board hearing held pursuant to section 17a-583."

[4] General Statutes § 17a-495 (c) provides in relevant part: "For the purposes of sections 17a-495 to 17a-528, inclusive, 'person with psychiatric disabilities' means any person who has a mental or emotional condition which has substantial adverse effects on his or her ability to function and who requires care and treatment . . . ."

General Statutes § 17a-495 (a) provides in relevant part: "For the purposes of sections 17a-75 to 17a-83, inclusive, and 17a-615 to 17a-618, inclusive, the following terms shall have the following meanings: . . . 'dangerous to himself or herself or others' means there is a substantial risk that physical harm will be inflicted by an individual upon his or her own person or upon another person . . . ."

General Statutes § 17a-495 (b) provides in relevant part: "For the purposes of sections 17a-450 to 17a-484, inclusive, 17a-495 to 17a-528, inclusive, 17a-540 to 17a-550, inclusive, and 17a-560 to 17a-576, inclusive, the following terms shall have the following meanings: . . . 'dangerous to himself or herself or others' means there is a substantial risk that physical harm will be inflicted by an individual upon his or her own person or upon another person . . . ."

that the defendant was, in fact, a danger to herself or others such that she was not a " '[p]erson who should be discharged' " from the jurisdiction of the board as defined by General Statutes § 17a-580 (11); and (3) violated the defendant's fundamental right to liberty by determining that her diagnosis of "a severe personality disorder not otherwise specified" warranted her continued confinement within a treatment facility. We conclude that the defendant's claims are without merit. Accordingly, we affirm the trial court's judgment denying the defendant's application for discharge.

The following undisputed facts and procedural history guide our resolution of this appeal. In 1991, the defendant was charged with manslaughter in the first degree in violation of General Statutes § 53a-55 (a)[5] for her involvement in the death of her infant daughter, Shawna March. The case was tried to the court, which reasonably could have found that the defendant had drowned the five and one-half month old child while in a dissociative psychotic state. Accordingly, the trial court found the defendant not guilty of manslaughter in the first degree by reason of mental disease or defect pursuant to § 53a-13 (a). The trial court thereafter committed the defendant to the jurisdiction of the board for a period not to exceed twenty years.

During her commitment, the defendant initially received inpatient treatment at Connecticut Valley Hospital (hospital). While undergoing that treatment, the defendant was allowed to make trips into the community under the supervision of her treatment professionals in order to work. In August, 1996, the board granted

---

[5] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance . . . ."

the defendant a conditional release to the supervision of the Capitol Region Mental Health Center (center). Throughout the period of her conditional release, the defendant had weekly home visits and therapy sessions with her treatment professionals.

While on conditional release, the defendant became romantically involved with James Harvey, a convicted felon, and requested the board's permission to live with Harvey. Although the defendant initially concealed Harvey's criminal history from her release supervisor, the board approved the living arrangement after receiving a positive recommendation from the center. Harvey moved into the defendant's apartment during the last week in December, 1998.

In August, 1999, after a three day absence, Harvey returned to the defendant's apartment and informed her that he had been having an affair with another woman over the course of several months. During the argument that ensued, Harvey grabbed the defendant and "threw" her across the room. The defendant telephoned the police immediately and Harvey then left the apartment. The defendant thereafter agreed to a management plan with the center that required that she not have any further contact with Harvey, that the defendant contact the police if Harvey contacted her, and that if the defendant were inclined to seek further contact with Harvey, further evaluation by the center would be necessary.

In May, 2000, the defendant applied for discharge from the jurisdiction of the board. As required under § 17a-593 (d),[6] the board, after two separate hearings,

---

[6] General Statutes § 17a-593 (d) provides: "The court shall forward any application for discharge received from the acquittee and any petition for continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the application or petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report."

filed a report with the court setting forth its recommendation with regard to the defendant's application. The report indicated that six members of the board were divided equally in their recommendation as to whether the defendant should be discharged. The report stated that three members of the board felt that the defendant had "demonstrated clinical stability over the course of her conditional release since 1996" and that she had "not exhibited any discernable symptoms of a mental illness for a significant number of years . . . ." Those three board members supported the defendant's application for discharge, further stating that "although [the defendant] could clinically benefit from ongoing treatment to support and help her interact with her environment, which is difficult for her at times, due to her personality disorder; public safety, at this point in time, does not require involuntary supervision or treatment, and that without such mandatory treatment, she would not pose a risk to herself or others."

Three other board members reached the opposite conclusion. While acknowledging the defendant's apparent success at remaining "clinically stable," the three members who opposed the defendant's application for discharge stated that "[the] conditional release program has not allowed for adequate assessment of whether [the defendant] can maintain the same level of clinical stability and compliance with societal norms at a lower level of treatment interventions, which would be available at the level one would receive as a voluntary client in the community without Board-ordered mandated oversight." These three board members further stated that "there is not adequate data to show that [the defendant] would not be a danger to herself or others if not under the jurisdiction of the [board]."[7]

---

[7] In its report to the court, the board stated that "[b]ased on the fact that the decision of the Board is a tie vote, the majority opinion will be considered the opinion that does not change the status of [the defendant]. Therefore, [the defendant] shall remain a person who should be conditionally released, that she has a psychiatric disability to the exten[t] that her final discharge

The hearing on the defendant's application for discharge in the trial court began on February 14, 2001, and concluded on March 23, 2001. On February 21, the board ordered a modification of the defendant's conditional release because the board found that the defendant had violated the terms of her conditional release by having unauthorized contact with Harvey, who was then incarcerated under a five year sentence for drug-related charges. The board requested that the defendant voluntarily readmit herself to the hospital, and the defendant complied with that request. The board then held a hearing on the modification of the defendant's conditional release on March 2, 2001.

Initially, the defendant denied having had contact with Harvey. Evidence was presented to the board that the defendant had 126 telephone conversations with Harvey and had visited him nine times while he was being held at the Hartford Correctional Center. On the advice of counsel, the defendant refused to undergo a psychological evaluation at the hospital; as a result, the board did not have a current risk assessment for the defendant. The board found that the defendant "based on her mental disorder . . . would currently pose a danger to herself or others if treated and supervised in the community." The board therefore unanimously determined that the defendant was "a person who should be confined in a hospital for psychiatric disabilities because she has a psychiatric disability that constitutes a danger to herself or others that cannot be adequately supervised and monitored in the community at this time." The board ordered that the defendant "shall remain confined at [the hospital] for the purposes of care, custody and treatment."

When the trial court resumed its hearing on the defendant's application for discharge in March, 2001, the

would constitute a danger to herself or others, but can be adequately treated and supervised in the community."

board's unanimous decision revoking the defendant's conditional release and returning her to inpatient status at the hospital was admitted into evidence. The trial court thereafter concluded that the defendant had failed to meet her burden of proving by a preponderance of the evidence that she was "a person who should be discharged" pursuant to General Statutes § 17a-593 (f) and (g). Relying largely on the board's revocation of the defendant's conditional release, and applying the definition of "psychiatric disabilities" found in General Statutes § 17a-458 (a), the trial court found that the defendant had "psychiatric disabilities to the extent that discharge would constitute a danger to herself or others . . . ." This appeal followed.

I

The defendant first claims that the trial court improperly employed the definition of " '[p]ersons with psychiatric disabilities' " from § 17a-458 (a)[8] in determining whether she was suffering from a psychiatric disability such that she constituted a danger to herself or others. More specifically, the defendant asserts that the trial court should have used the more stringent definition of "psychiatric disabilities" in § 17a-495 (c), which governs civil commitment and requires a mental or emotional condition that has "substantial adverse effects" on functioning, and the definition of dangerousness set forth in § 17a-495 (a) and (b),[9] which requires a "substantial risk" of physical harm. We disagree with the defendant.

---

[8] General Statutes § 17a-458 provides in relevant part: "When used in this section and sections 17a-450, 17a-451, 17a-455, 17a-457, 17a-465, 17a-470, 17a-472, 17a-473 and 17a-475 unless otherwise expressly stated or unless the context otherwise requires:

"(a) 'Persons with psychiatric disabilities' means those persons who are suffering from one or more mental disorders as defined in the most recent edition of the American Psychiatric Association's 'Diagnostic and Statistical Manual of Mental Disorders' . . . ."

[9] See footnote 4 of this opinion.

At the outset, we review briefly the statutory procedure applicable to an application for discharge from the jurisdiction of the board pursuant to § 17a-593. After an acquittee has applied for discharge from the board's jurisdiction and the board, in accordance with the requirement of § 17a-593 (d), has filed its report regarding whether the acquittee should be discharged, the trial court must hold a hearing on the application, at which the acquittee bears the burden of proving that he or she is "a person who should be discharged." General Statutes § 17a-593 (f).[10] After the hearing, the court, "considering that its primary concern is the protection of society," must make a finding as to whether the acquittee is a person who should be discharged. General Statutes § 17a-593 (g).[11] The term " '[p]erson who should be discharged' " is defined as "an acquittee who does not have psychiatric disabilities . . . to the extent that his discharge would constitute a danger to himself or others . . . ." General Statutes § 17a-580 (11). The statutes governing the board; General Statutes § 17a-580 et seq.; do not, however, provide any definition of "psychiatric disabilities."

The meaning of "psychiatric disabilities" under § 17a-580 (11) is a question of statutory interpretation, over which our review is plenary. *Munroe* v. *Zoning Board*

---

[10] General Statutes § 17a-593 (f) provides: "After receipt of the board's report and any separate examination reports, the court shall promptly commence a hearing on the recommendation or application for discharge or petition for continued commitment. At the hearing, the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged."

[11] General Statutes § 17a-593 (g) provides in relevant part: "The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the . . . application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. . . ."

*of Appeals*, 261 Conn. 263, 269, 802 A.2d 55 (2002). The defendant claims that the appropriate definition of psychiatric disabilities for purposes of §§ 17a-593 and 17a-580 (11) is the one found in § 17a-495 (c), which requires that the person have "a mental or emotional condition which has substantial adverse effects on his or her ability to function . . . ." This is the standard required before a person can be committed civilly through a proceeding in the Probate Court pursuant to § 17a-495 et seq. The state, by contrast, maintains that the appropriate definition is that found in § 17a-458 (a), on which the trial court relied. Although we conclude that neither § 17a-495 (c) nor § 17a-458 (a) applies to the present case, we further conclude that the trial court applied the correct standard in its interpretation of § 17a-593.

The statutes relevant to this appeal, General Statutes §§ 17a-580 to 17a-603, are contained in part V of chapter 319i, which is entitled "Psychiatric Security Review Board." General Statutes § 17a-581 (j)[12] authorizes the board to adopt regulations necessary to carry out the purposes of chapter 319i. Section 17a-581-1 of the Regulations of Connecticut State Agencies provides: "These rules and regulations will govern practice and procedures before the [board] as authorized by Sections 17a-580 through 17a-602 of the General Statutes." Section 17a-581-2 (a) (11) of the Regulations of Connecticut State Agencies corresponds to § 17a-580 (11) of the General Statutes. As noted previously, the latter defines a person who should be discharged pursuant to § 17a-593 as "an acquittee who does not have psychiatric disabilities . . . to the extent that his discharge would constitute a danger to himself or others"; General Statutes § 17a-580 (11); whereas the former provides that

---

[12] General Statutes § 17a-581 (j) provides: "The board may adopt in accordance with chapter 54 such regulations as may be necessary to carry out the purposes of sections 17a-580 to 17a-602, inclusive."

" '[p]erson who should be discharged' means an acquittee who is not mentally ill or mentally retarded to the extent that his discharge would constitute a danger to himself or others." Regs., Conn. State Agencies § 17a-581-2 (a) (11). Subsection (a) (5) of the same regulation defines "mental illness" as follows: " 'Mental illness' means any mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association and as may hereafter be amended. . . ."[13] Regs., Conn. State Agencies § 17a-581-2 (a) (5).

The regulations governing the board have been in effect since 1992. See footnote 13 of this opinion. Pursuant to the provisions of the Uniform Administrative Procedure Act, such regulations must be submitted to the legislative regulation review committee for approval prior to adoption. See General Statutes § 4-170 (a).[14] We have held consistently that when a regulation is approved by the legislative regulation review commit-

---

[13] Any doubt that the term "psychiatric disabilities," as used in § 17a-580 (11), means a "mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association" pursuant to § 17a-581-2 (a) (5) of the regulations should be dispelled by a reading of General Statutes § 17a-458a (a). That provision mandates substitution of the term "psychiatric disabilities" for the term "mental illness" in § 17a-593, the underlying statute concerning the discharge of acquittees from custody. See footnote 3 of this opinion. Section 17a-458a (b) further mandates substitution of the terms "person with psychiatric disabilities" or "persons with psychiatric disabilities" for the terms "mentally ill person" or "mentally ill persons" as used in § 17a-580 of the General Statutes. Significantly, the statutory mandates refer only to the substitution of *terms*, and not to the substitution of *definitions*. Indeed, no alternative definition of the term "psychiatric disabilities" is provided, because none is required. The term "mentally ill person" was changed to "person with psychiatric disabilities" pursuant to § 17a-458a (b) of the General Statutes in 1995. Public Acts 1995, No. 95-257, § 16. The regulations promulgated under § 17a-581 (j) have been in effect since 1992. See Regs., Conn. State Agencies §§ 17a-581-1 through 17a-581-59.

[14] General Statutes § 4-170 (a) provides in relevant part: "There shall be a standing legislative committee to review all regulations of the several state departments and agencies following the proposal thereof . . . ."

tee, such "ratification of a proposed regulation by the review committee is an important consideration in determining whether a regulation is consistent with a statutory scheme." *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 623, 662 A.2d 762 (1995). "[Moreover, if] a regulation has been in existence for a substantial period of time and the legislature has not sought to override the regulation, this fact, although not determinative, provides persuasive evidence of the continued validity of the regulation." (Internal quotation marks omitted.) *Orkney* v. *Hanover Ins. Co.*, 248 Conn. 195, 204, 727 A.2d 700 (1999). Section 17a-581-2 (5) of the regulations was approved by the legislative regulation review committee and has been in effect for more than eleven years.

Thus, it is apparent that the meaning of "psychiatric disability" as used in part V of chapter 319i is governed by the statutes contained therein and the regulations promulgated pursuant to those statutes. The definitions found in § 17a-458 (a) do not apply to part V of chapter 319i because that statute specifically enumerates the sections to which it applies and does not refer to any of the sections in part V. See footnote 8 of this opinion. Section 17a-581-2 of the regulations, however, contains language very similar to that of § 17a-458 (a), and both impose the same standard for determining whether an individual has a psychiatric disability because both merely incorporate by reference those disorders defined by the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. Therefore, although the trial court looked to the wrong statute for the proper definition of "psychiatric disability," it nonetheless applied the correct standard.

Our rejection of the defendant's claim that the definition of psychiatric disabilities in § 17a-495 applies to criminal acquittees also disposes of her claim that the definition of dangerousness in § 17a-495 applies to her.

Section 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies defines " '[d]anger to self or to others,' " as used in General Statutes § 17a-580 (5),[15] as "the risk of imminent physical injury to others or self," including "the risk of loss or destruction of the property of others." The defendant's claim that the court should have used the more stringent standard reflected in the definition of dangerousness contained in the civil commitment statute is, therefore, unpersuasive because the regulation approved by our legislature expressly states the manner in which the board must construe dangerousness when deciding whether to grant or deny an acquittee's application for discharge.

## II

The defendant next claims that the trial court improperly found that she posed a danger to herself or others. She further asserts that the trial court's assessment of an acquittee's dangerousness is a mixed question of fact and law that this court should review de novo. In response, the state argues that the trial court properly determined that the defendant posed a danger to herself or to others, and that the trial court's determination resolved a question of fact. The state contends, therefore, that the trial court's determination is to be reviewed under the clearly erroneous standard applicable to findings of fact. We agree with the state.

The following facts are relevant to the resolution of this issue. In its memorandum of decision, the trial court stated the following: "What leads this court to conclude that the [defendant] has psychiatric disabilities *to the extent that discharge would constitute a danger to herself or others* is that after more than four years of conditional release and during the pendency of this proceeding, on March 16, 2001, that conditional

---

[15] General Statutes § 17a-580 (5) provides: " 'Danger to himself or others' includes danger to the property of others . . . ."

release was revoked and the [defendant] returned to confinement. It is the timing and nature of the underlying behavior that raise concerns of dangerousness." (Emphasis in original.) The trial court then quoted extensively from the board's decision revoking the defendant's conditional release, concluding with the board's factual finding that " '[the defendant], based on her mental disorder, which led her to violate her conditional release and to conceal her behavior from her treaters, demonstrating her lack of engagement in treatment, would currently pose a danger to herself or others if treated or supervised in the community.' " The court then stated: "The board ultimately concluded that the [defendant] should be confined because 'she has a psychiatric disability that constitutes a danger to herself or others that cannot be adequately supervised and monitored in the community at this time.' . . . This conclusion was reached by the same board that six months ago could not agree that the [defendant] was either a person who should be discharged or a person who should be confined. . . . Because this court's primary concern is the protection of society and because the [defendant] has failed to meet her burden of proving that she is a person who should be discharged, the application [for discharge from the board's jurisdiction] is denied."

We begin by addressing the dispute between the parties with regard to the applicable standard of review. In urging plenary review, the defendant relies on this court's decision in *State* v. *Putnoki*, 200 Conn. 208, 219, 510 A.2d 1329 (1986), in which the court stated that "[a]lthough a trial court may choose to attach special weight to the testimony of medical experts at a hearing to determine mental status, the ultimate determination of mental illness and dangerousness *is a legal decision.*" (Emphasis added.) We disagree that this statement from *Putnoki* means that a trial court's

determination of an acquittee's dangerousness is *a question of law.*

The statement on which the defendant relies must be understood in its proper context. In *Putnoki,* this court addressed, inter alia, the question of whether a trial court must defer to medical authorities when determining the dangerousness of an acquittee. We concluded in *Putnoki* that the trial court was not bound by the testimony or conclusions of psychiatrists partly because "psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable." Id., 219–20. The court's statement in *Putnoki* that the determination of mental illness and dangerousness is a legal decision addressed this distinction between a purely medical decision and a legal decision based, in part, on medical testimony. The court did not address whether dangerousness is a question of fact or one of law. Indeed, this court previously had made such a determination in *State* v. *Lafferty,* 189 Conn. 360, 363, 456 A.2d 272 (1983), in which the court concluded that a determination of dangerousness is a question of fact.

"To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." *Waterbury* v. *Washington,* 260 Conn. 506, 576, 800 A.2d 1102 (2002). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Blitz* v. *Subklew,* 74 Conn. App. 183, 186, 810 A.2d 841 (2002).

We conclude that the trial court's adoption of the board's finding that the defendant posed a danger to herself or others was not clearly erroneous. Although

the defendant presented the testimony of psychiatric experts who testified that she did not present a danger either to herself or to others, the trial court was free to reject that testimony in favor of the findings of the board. As we noted in *State* v. *Putnoki*, supra, 200 Conn. 220–21, "the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. . . . The 'awesome task' of weighing these two interests and arriving at a decision concerning release rests finally with the trial court." (Citations omitted.)

In its decision, the board clearly and unanimously determined that the defendant would pose a danger to herself or others if she were to be released into the community. In its role as fact finder, the trial court credited the board's opinion and relied on its findings, which the court properly could choose to do. The trial court's findings with regard to the defendant's dangerousness were not clearly erroneous.

### III

The defendant's final claim is that the trial court's conclusion that the defendant's diagnosis of a severe personality disorder constitutes a psychiatric disability justifying involuntary confinement was arbitrary, fundamentally unfair and in violation of the defendant's right to substantive due process. The defendant further contends that the trial court's determination that a severe personality disorder can justify further confinement

contravenes the United States Supreme Court's holding in *Foucha* v. *Louisiana*, 504 U.S. 71, 77, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992), which, the defendant claims, requires a nexus between the acquittee's original diagnosis and the acquittee's current commitment. We disagree.

In addressing this issue, we first note that our Appellate Court recently addressed a similar claim in *State* v. *Jacob*, 69 Conn. App. 666, 798 A.2d 974 (2002). As in the present case, the Appellate Court evaluated a criminal acquittee's claim that the trial court's finding that he was both dangerous and mentally ill contravened the holding of *Foucha*. In *Jacob*, the acquittee argued that the trial court improperly had found that he was dangerous despite the fact that no testimony that he constituted a danger to himself or to others had been elicited during his discharge hearing. Id., 680–81. The acquittee further argued that the trial court's finding that he was mentally ill contravened the rule of *Foucha* in that his diagnosis at the time of the discharge hearing "[bore] no reasonable relationship to his original acquittal and commitment because it [was] not the diagnosis that was the basis for that commitment." Id., 688. The Appellate Court concluded that the rule announced in *Foucha* was not applicable to the acquittee's case because of distinguishable facts, and, further, that *Foucha* does not require that a diagnosis that justifies continued confinement be the same diagnosis that led to the original acquittal. Id., 687–89.

As the Appellate Court stated in *Jacob*: "In *Foucha* v. *Louisiana*, supra, 504 U.S. 71, the United States Supreme Court declared unconstitutional a Louisiana statute that allowed an insanity acquittee to be committed indefinitely to a mental institution until he was able to demonstrate that he was not dangerous to himself or others, despite the fact that he no longer suffered from any mental illness. Id., 75–85. The [Supreme Court]

reiterated the principle it first announced in *Jones* v. *United States*, [463 U.S. 354, 368, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983)] that, as a matter of due process, an acquittee is entitled to release when he either (1) recovered his sanity or (2) is no longer dangerous." *State* v. *Jacob*, supra, 69 Conn. App. 686. In *State* v. *Metz*, 230 Conn. 400, 417–18, 645 A.2d 965 (1994), we stated that "[w]ith respect to release from confinement, this court has adopted the principle enunciated in *Jones* and reiterated in *Foucha* that, as a matter of due process, an acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." The defendant in the present case contends that her severe personality disorder is not a mental illness for the purposes of continued confinement because it does not implicate her level of dangerousness and does not bear a sufficient relationship to the psychosis that led to her confinement. As did the Appellate Court in *Jacob*, we reject the contention that *Foucha* is applicable to the present case. We further adopt the analysis of the Appellate Court in *Jacob*.

In *Jacob*, the court held that "the holding in *Foucha* is inapplicable here because the factual circumstances underlying that case are readily distinguishable from the facts in the present case. First, unlike the Louisiana statute at issue in *Foucha*, which indefinitely allocated the burden of proving nondangerousness to the insanity acquittee; *Foucha* v. *Louisiana*, supra, 504 U.S. 81–82; the Connecticut statute at issue here, § 17a-593, fixes a definite period of time during which the acquittee must carry the burden of proving by a preponderance of the evidence that he is not dangerous, namely, until the maximum period of his commitment has expired. *State* v. *Metz*, supra, 230 Conn. 425. After that point, if the state seeks to continue the acquittee's commitment, it must then carry the burden of proving by clear and

convincing evidence that the acquittee is mentally ill and dangerous. Id.

"Second, the United States Supreme Court's holding in *Foucha* that continued confinement was violative of due process turned on the fact that the state had conceded that the acquittee was not mentally ill and that it was seeking to perpetuate his confinement solely on the basis that he was dangerous. *Foucha* v. *Louisiana*, supra, 504 U.S. 77–79. The court explained that an acquittee may properly be committed only when he is both mentally ill and dangerous and that once the acquittee's mental illness had disappeared, the state's basis for holding him in a psychiatric facility had also disappeared. Id., 76–80. Here, the [trial] court did not dismiss the acquittee's application for discharge solely on the basis that the acquittee would pose a danger if discharged. In addition to finding that the acquittee was dangerous, the court in the present case also found that the acquittee remains mentally ill and that his potential dangerousness is due to that mental illness. Accordingly, we conclude that the holding in *Foucha*, that an acquittee who is dangerous but not mentally ill may not be confined in a psychiatric facility, is inapplicable to the facts of the present case." *State* v. *Jacob*, supra, 69 Conn. App. 687–88.

We next address the defendant's claim that the trial court violated the rule in *Foucha* by basing its findings, in part, on a mental health diagnosis that differed from the psychosis that led to her confinement. Again, we adopt the reasoning of the Appellate Court in *Jacob*: "In *Foucha*, the court explained that '[d]ue process requires that *the nature* of commitment bear some reasonable relation to *the purpose* for which the individual is committed.' . . . [*Foucha* v. *Louisiana*, supra, 504 U.S.] 79. The purpose of the commitment 'is to treat the individual's mental illness and protect him and society from his potential dangerousness.' *Payne* v. *Fairfield*

*Hills Hospital,* [215 Conn. 675, 683–84, 578 A.2d 1025 (1990)]. Thus, as long as an acquittee has a mental illness that requires confinement for purposes of treatment and protection, his confinement to a psychiatric facility is reasonably related to the purpose of commitment and is, therefore, constitutional. *Foucha* v. *Louisiana,* supra, [78–79].

"It is true that the court should take into consideration the acquittee's past and present diagnoses in assessing dangerousness for purposes of a § 17a-593 discharge hearing. See *State* v. *Putnoki,* supra, 200 Conn. 221. We conclude, however, that the reason for doing so is not to assess whether the acquittee's diagnosis has remained constant throughout the length of his commitment but, rather, to determine whether he still suffers from *a* mental illness.

"It is not important that the mental illness that the acquittee is currently diagnosed with is different from the mental illness that led to his acquittal and confinement. Section 17a-593 (g), which requires the court to consider the protection of society as its primary concern at a discharge hearing, would make little sense if the court had to discharge an acquittee because his diagnosis had changed but where his current mental illness is . . . as dangerous to himself or others as was his previously diagnosed mental illness. What is important is that the mental illness that the acquittee is currently diagnosed with be of the type of mental illness that might cause the acquittee to be dangerous if discharged." (Emphasis in original.) *State* v. *Jacob,* supra, 69 Conn. App. 688–89.

We concluded previously in this opinion that the trial court applied the proper standard for determining whether the defendant had a psychiatric disability and properly found that the defendant posed a danger if released. We now further conclude that the trial court's

determination that the defendant is not a person who should be discharged was not arbitrary, fundamentally unfair or intended to facilitate her perpetual confinement, which would be violative of the principles articulated in *Foucha*. Accordingly, we conclude that the trial court's determination that the defendant had not proven by a preponderance of the evidence that she was a person who should be discharged did not violate her right to substantive due process.

The judgment is affirmed.

In this opinion KATZ, PALMER and ZARELLA, Js., concurred.

VERTEFEUILLE, J., concurring. I concur with the result reached by the majority affirming the judgment of the trial court and with parts II and III of the majority opinion. I do not join, however, in part I of the opinion. While I agree with the majority that the trial court properly applied a definition of "psychiatric disabilities" that requires a diagnosis from the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association,[1] I believe the majority's efficient means of reaching this conclusion ignores the important history and legislative backdrop of definitions of "psychiatric disabilities" as applied to criminal acquittees. I also believe that this approach simply does not respond adequately to the legitimate questions raised by the defendant, Dawn March, on appeal. Although it is true that the promulgated regulations of the psychiatric security review board (board) provide a proper definition of psychiatric disabilities, the majority's analysis fails, I believe, to provide the appropriate context for the resolution of the defendant's claim.

This court previously has acknowledged that criminal acquittees have a special status that differs from the

---

[1] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994).

status of those committed through the civil commitment process (civil committees). In *State* v. *Metz*, 230 Conn. 400, 416–17, 645 A.2d 965 (1994), we stated that "our statutes distinguish between those who are civilly committed and those who are insanity [criminal] acquittees. We have upheld the validity of such disparities in a number of cases. *State* v. *Miller*, 192 Conn. 532, 538, 472 A.2d 1272 (1984); *State* v. *Reed*, 192 Conn. 520, 529, 532, 473 A.2d 775 (1984). The use of a less demanding measure of the quantum of evidence for the initial confinement of [criminal] acquittees than that afforded civil committees . . . has been constitutionally justified because of the unique status of persons acquitted by reason of insanity. *State* v. *Miller*, supra, 538; *Warren* v. *Harvey*, 632 F.2d 925, 931 (2d Cir. 1980); *State* v. *Warren*, 169 Conn. 207, 215, 363 A.2d 91 (1975). We have acknowledged that [t]he obvious difference between insanity [criminal] acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act. *Warren* v. *Harvey*, supra, 931; *State* v. *Warren*, supra, 215." (Internal quotation marks omitted.)

The United States Supreme Court also has recognized the special status of criminal acquittees. In *Jones* v. *United States*, 463 U.S. 354, 370, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), the court held "that when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society. This holding accords with the widely and reasonably held view that insanity [criminal] acquittees constitute a special class that should be treated differently from other candidates for commitment." See also *Parrish* v. *Colorado*, 78 F.3d 1473, 1475–76 (10th Cir. 1996).

Accordingly, I would conclude that the well recognized special status of criminal acquittees does not warrant the application of the higher, civil commitment definition of psychiatric disabilities when determining whether criminal acquittees are persons who continue to suffer from "psychiatric disabilities."

Although the legislature did not adopt a definition of psychiatric disability for purposes of General Statutes § 17a-580 (11), it did make clear that the principal concern in the decision whether to discharge an acquittee was public safety. General Statutes § 17a-593 (g) provides that in deciding whether to discharge the acquittee, the court should consider "that its primary concern is the protection of society . . . ." Applying the higher, civil commitment standard for psychiatric disabilities for criminal acquittees seeking discharge, as the defendant urges, would not be consistent with the clear legislative intention in § 17a-593 (g) of protecting society while at the same time discharging criminal acquittees who are not psychiatrically disabled to the extent that they are dangerous.

I would also address, and reject, the defendant's contentions that at all times since the adoption of the statutes relating to the board, the legislature clearly intended that the civil commitment definition of psychiatric disabilities be applied by the trial court when evaluating a criminal acquittee's application for discharge. The defendant further contends that when the legislature amended General Statutes § 17a-495 in 1994 to delete from that section the reference to statutes relating to the board; see Public Acts 1994, No. 94-27, § 1 (P.A. 94-27); it did not intend to separate the standards associated with civil commitment from those governing criminal acquittees. Consequently, the defendant argues, the definition of psychiatric disability contained in § 17a-495 is still the correct definition to be applied to § 17a-593. I do not agree with these contentions.

The statutory scheme that created the board (board statutes) was adopted by the legislature in 1985 and became effective July 1 of that year. Public Acts 1985, No. 85-506. Prior to the enactment of that statutory scheme, General Statutes § 17-176 was the definition section for our civil commitment statutes and provided in relevant part: *"For the purposes of this chapter,* the following terms shall have the following meanings . . . ." (Emphasis added.) General Statutes (Rev. to 1985) § 17-176. In 1987, the board statutes enacted in 1985 were codified for the first time in the General Statutes in chapter 306. See General Statutes (Rev. to 1987) § 17-257a et seq. As a result, the previously existing definitions found in § 17-176 applied to the board simply because of the codification of the board statutes within chapter 306. In 1991, § 17-176 was transferred and recodified as § 17a-495, and for the first time, the statutes to which the definitions of § 17a-495 were to be applied were enumerated specifically. General Statutes (Rev. to 1991) § 17a-495 then provided in relevant part: "For the purposes of sections 17a-75 to 17a-83, inclusive, 17a-450 to 17a-484, inclusive, 17a-495 to 17a-528, inclusive, 17a-540 to 17a-550, inclusive, 17a-560 to 17a-576, inclusive, *17a-580 to 17a-603,* inclusive, and 17a-615 to 17a-618, inclusive, the following terms shall have the following meanings . . . ." (Emphasis added.) The board statutes, then codified at General Statutes § 17a-580 et seq.,[2] therefore, specifically were referenced in § 17a-495. As a result of the 1994 amendment to § 17a-495, however, the specific reference to the board statutes, General Statutes §§ 17a-580 through 17a-603, was deleted from § 17a-495. See P.A. 94-27, § 1. The definitions in § 17a-495, therefore, no longer specifically applied to the board.

---

[2] In 1991, the board statutes, then General Statutes §§ 17-257a through 17-257w, also had been transferred and recodified at General Statutes §§ 17a-580 through 17a-603.

A review of the legislative history of P.A. 94-27 reveals that the legislature intended to sever any connection between the legal standards applicable to civil commitment and those applicable to criminal acquittees. In support of House Bill No. 5477, which became P.A. 94-27, Martha Lewis, the executive director of the board, presented written testimony that included the following statement: "This bill clarifies that commitment to the [board] is solely for a person acquitted by mental disease or mental defect of a criminal act. This bill removes all references to the statutes governing the [board] and commitment to the [b]oard by the Superior Court from the statutes governing civil commitment of the mentally ill or mentally retarded. The purpose of the statutes governing commitment to the [b]oard are different from a civil commitment. *The public safety purpose of the [board] and the fact that persons under its jurisdiction have been found to have committed a criminal offense allow for different procedures and legal standards rather than those which are dictated in the procedures of a civil commitment.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1994 Sess., p. 358.

A review of the proceedings in the state Senate discloses a similar statement from Senator George C. Jepsen, who was a member of the judiciary committee: "This bill corrects an anomaly in the statutes which is that the [board] . . . was originally intended to deal exclusively with the issues surrounding the release of individuals who have been found guilty of crimes, but have been committed because of mental illness or have been committed because they present a danger. In short, they're kind of the criminal side of the equation." 37 S. Proc., Pt. 3, 1994 Sess., p. 1013.

Lewis and Jepsen both gave statements during hearings on the bill underlying P.A. 94-27 that indicate that the original inclusion of the board statutes within the

civil commitment statutes in the 1987 revision of the General Statutes was a codification error. Lewis stated that "the current statutory references that are deleted by [P.A. 94-27] were a result of a codification process and not a result of substantive intent." Conn. Joint Standing Committee Hearings, supra, p. 359. Senator Jepsen stated: "*For technical reasons,* this board has been brought . . . into statutory references that deal with the Probate issues before Probate Courts that deal with a judgment of individuals, whether they're competent to handle their own affairs, clearly, something radically different, [than] simply an individual, who for one reason or other, is no longer [able] to maintain their checking accounts or maintain lives . . . . That's very different from the criminal side of an individual who commits a crime . . . ." (Emphasis added.) 37 S. Proc., supra, pp. 1013–14. The deletions effected by P.A. 94-27 included the deletion of the board statutes, § 17a-580 et seq., from § 17a-495.

On the basis of this legislative history, I would conclude, first, that the original incorporation of the board statutes into the chapter of our statutes addressing civil commitment in 1987 was a codification error. Second, I would conclude that the adoption of P.A. 94-27 was a purposeful reversal of this error, designed to separate the procedures regarding criminal acquittees from those regarding civil committees. I would therefore reject the defendant's contention that P.A. 94-27 was not intended to reverse the inclusion of the board statutes as statutes to which civil commitment definitions were to be applied and that the 1994 amendment of § 17a-495 created inadvertent ambiguity in the definitions of psychiatric disability and dangerousness to be applied to criminal acquittees.