For the reasons stated, I respectfully dissent.

STATE OF CONNECTICUT *v.* WILLIAM J. WARREN
(AC 22768)

Dranginis, Flynn and West, Js.

Argued March 25—officially released June 24, 2003

*Richard E. Condon, Jr.,* assistant public defender, for the appellant (acquittee).

*Bruce R. Lockwood,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The acquittee, William J. Warren, appeals from the judgment of the trial court ordering his continued commitment to the psychiatric security board of review (board) pursuant to General Statutes § 17a-593. He claims that the state failed to prove by clear and convincing evidence that he was a danger to himself or others. We affirm the judgment of the trial court.

The following facts are relevant to our analysis of this appeal. In 1971, the acquittee shot and killed his neighbor during an argument over the neighbor's explosion of fireworks near guests at the acquittee's home. The acquittee was charged with murder in the first degree pursuant to General Statutes § 53-9.[1] After a 1974 trial, a jury found him not guilty by reason of mental disease or defect. The court then committed him to the custody of the commissioner of mental health for an indefinite period of time, not to exceed twenty-five years. On July 1, 1985, by operation of law, the acquittee was committed to the jurisdiction of the board. See General Statutes § 17a-602. The acquittee's maximum term of commitment was to expire on May 24, 1999.

About eight months before that expiration, the state filed a petition for the acquittee's continued commitment; see General Statutes § 17a-593 (c); on the grounds that he remained mentally ill and his release would constitute a danger to himself or others. Subsequently, the acquittee voluntarily extended his commitment several times, and the court eventually heard testimony on the state's petition for continued commitment on August 24, 2000, and July 2 and 11, 2001. The state presented the testimony of treating psychiatrists Keith Scott and Virginia Johnson. The acquittee testified on his own behalf.

The acquittee conceded the fact that he was mentally ill.[2] The court, therefore, was left to determine whether he was dangerous to himself or others. The court found

---

[1] General Statutes § 53-9 subsequently was repealed. We note that, pursuant to General Statutes § 53a-54a, there are no degrees of murder.

[2] The acquittee described the symptoms of his mental illness as follows: "Lowered ability to handle stress. I tend to take a negative attitude toward situations. I will tend to be irritated over things that other people would not be irritated over. I will feel quite a bit of anxiety because of this condition."

We note that the state also presented similar evidence concerning the acquittee's mental illness.

that the state had proven by clear and convincing evidence that the acquittee was mentally ill and dangerous to others. Consequently, the court concluded that his commitment should be extended by three years from the date of its decision. This appeal followed.

The acquittee raises a single issue on appeal, although he makes several distinct arguments in support of that issue. The issue, as set forth in the acquittee's brief, is whether "[t]he state's evidence was insufficient to prove, by clear and convincing evidence, that, if discharged, [the acquittee] presents substantial risk of inflicting harm upon himself or another person." The acquittee's arguments are focused principally on the evidentiary sufficiency of the testimony of the two psychiatrists and the facts on which they relied in reaching their opinions that the acquittee was dangerous. The acquittee argues that his own testimony provided the only evidence of his conduct outside of an institutional setting.

We begin our analysis by considering the appropriate standard of review for the present case. The acquittee asserts that the controlling standard of review has not been established in the context of reviewing the court's findings on a petition by the state for an acquittee's continued commitment. He argues that we should treat the propriety of the court's granting of the state's petition for continued commitment as a mixed question of law and fact. However, he requests that we treat the question of whether the state presented clear and convincing evidence to support the continued commitment as a question of law that should be reviewed de novo. The state argues that we should apply the clearly erroneous standard of review. We agree with the state.

The standard of review applicable in the present case was set forth recently in *State* v. *Jacob*, 69 Conn. App. 666, 798 A.2d 974 (2002), where we said, "The determi-

nation as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. See *State* v. *Warren*, 169 Conn. 207, 211–12, 363 A.2d 91 (1975). A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *State* v. *Jacob*, supra, 680; see also *United States* v. *Steil*, 916 F.2d 485, 487–88 (8th Cir. 1990) (holding that clearly erroneous standard applies to review District Court's determination of dangerousness under 18 U.S.C. § 4246); *People* v. *Lang*, 189 Ill. App. 3d 384, 390, 545 N.E.2d 327 (1989) (upholding trial court's commitment order unless manifestly erroneous); *In re Rodriguez*, 506 N.W.2d 660, 662 (Minn. App. 1993) (applying clearly erroneous standard to finding that appellant had psychopathic personality); *In Interest of J.S.*, 530 N.W.2d 331, 333 (N.D. 1995) (applying clearly erroneous standard to trial court's order of continued treatment).

We acknowledge that the situation in *State* v. *Jacob*, supra, 69 Conn. App. 666, is not identical to the present case because in *Jacob* it was an acquittee who had filed an application seeking early discharge from the custody and jurisdiction of the board. Id., 669. In that case, the acquittee had the burden of proving by a preponderance of the evidence that he was a person who should be discharged. See General Statutes § 17a-593 (f). In contrast, in the present case where the state petitioned for

the continued commitment of the acquittee, the state had the burden of proving by clear and convincing evidence that the acquittee was mentally ill and dangerous to himself or others. See *State* v. *Metz*, 230 Conn. 400, 425, 645 A.2d 965 (1994). Given our application of the clearly erroneous standard of review in other contexts, however, we conclude that the lack of perfect identity of facts between *Jacob* and the present case does not warrant a departure from the clearly erroneous standard of review.

We have applied the clearly erroneous standard of review in other contexts in which the trial courts' conclusions implicated rights no less fundamental than those involved here. For example, when the state has petitioned for a termination of parental rights, pursuant to General Statutes § 17a-112, we apply the clearly erroneous standard of review to the court's determination that the petition is supported by clear and convincing evidence. See, e.g., *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003). We also review the sufficiency of the evidence in support of a court's forcible medication of a defendant under the clearly erroneous standard. See *State* v. *Garcia,* 235 Conn. 671, 679, 669 A.2d 573 (1996). In both of these situations, the state has the burden of providing clear and convincing evidence.

We also find persuasive the holding of the United States Court of Appeals for the Eighth Circuit in *United States* v. *Steil,* supra, 916 F.2d 487–88. In that case, the defendant, Steil, was found incompetent to stand trial, and the government filed "a petition to determine the present mental condition of an imprisoned person due for release pursuant to Section 4246." Id., 486. The defendant argued that the District Court erroneously found that the government met its burden of showing by clear and convincing evidence that the defendant's release would present a substantial risk of bodily injury to another person or serious damage to the property

of another as a result of his mental illness. Id. In making its determination of the appropriate standard of review, the court considered the standard of review in two situations that it found analogous: transfers of federal prisoners to mental health hospitals pursuant to 18 U.S.C. § 4245 and determinations regarding a defendant's competence to stand trial. Id., 487–88. In both of those situations, the reviewing court applies the clearly erroneous standard of review. The Eighth Circuit therefore concluded that the clearly erroneous standard of review was appropriate in cases in which the government requests that a person be committed pursuant to Section 4246. Id., 488.

Furthermore, it would be inappropriate for this court to conduct a de novo review of the evidence, as the acquittee requests, when we are faced with the issue of whether the evidence was sufficient to support the court's decision. We are not in a position to assess the credibility of the witnesses and reweigh the evidence as a de novo review would require. See *State* v. *Fernandez*, 254 Conn. 637, 647–48, 758 A.2d 842 (2000) (declining to apply de novo review to highly fact based decision of trial court on counsel's motion to withdraw), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001); *State* v. *Santiago*, 252 Conn. 635, 640, 748 A.2d 293 (2000) (declining to review de novo trial court's conclusions as to allegations of juror's racial bias); *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 57–58, 818 A.2d 14 (2003) (holding court's reweighing of evidence improper as de novo review of record).

Having determined that we must apply the clearly erroneous standard of review to the findings of the court as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged, we conclude that the court's findings in the present case are not clearly erro-

neous. The court received evidence from several sources by which it could determine whether the acquittee's release would pose a danger to himself or others. "In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986).

Scott testified that, for most of the time that the acquittee had been committed, he had the diagnosis of paranoid schizophrenia. The acquittee's diagnosis changed when tests revealed an abnormality in the hippocampal area of his brain. Scott testified that he diagnosed the acquittee with "personality changes due to right temporal, frontal syndromes, with possible right hippocampal involvement, combined type, paranoid and labile." The psychiatrists also described the symptoms associated with the acquittee's mental illness: paranoia, depression and difficulties with stress, anger and impulsivity.[3] The acquittee described his symptoms as well. He testified that he tends to become "very irritated with very little provocation" and that he is "easier to anger than [the] general population." Scott

---

[3] The court file also contains a letter dated September 26, 1972, to the court in the underlying criminal case against the acquittee. This letter further illuminates the acquittee's history of mental illness. In 1972, Mehadin K. Arafeh performed a psychiatric evaluation of the acquittee in order to advise the court as to his competence to stand trial. In the letter, the psychiatrist states the following: "[The acquittee] was unable to maintain a stable work condition, moved a great deal, and was unable to develop stable relationships. Since childhood, he has had difficulty controlling his temper or being able to tolerate frustration. . . . He did not have hallucinatory experiences, but did develop feelings of reference and influence, such as someone is following him. He also developed moderate paranoid ideas, feeling that his bosses were against him to the extent that they hired detectives to follow him day and night."

testified that, although the acquittee understands in a theoretical way the symptoms he experiences, he has difficulty applying that theoretical knowledge to real-life situations so that he is unable to identify when he is acting irrationally. Scott opined that "[the acquittee] has very little insight in how he takes a situation and exaggerates it, though, he could tell you about working memory deficits and how as a result of them he fills in gaps. He doesn't connect that filling in gaps could lead him to the wrong conclusion because he always comes to, but this time I'm right, and he always comes to that conclusion."

Evidence of the acquittee's history of mental illness and the change from past to present diagnoses was considered by the court. For instance, the acquittee testified that, early in the course of his confinement, he lied to his treating physician, telling him that he was hearing voices. This alleged misrepresentation apparently was motivated by noise in the jail where he was being detained at the time.[4] Due to his low tolerance for stress, the acquittee was unable to cope with the noise, and so he lied about hearing voices and was diagnosed as being paranoid schizophrenic. The court noted this testimony in its decision when it stated, "an individual who admits to inducing an inaccurate diagnosis that endured for decades by lying to the experts is hardly an appropriate source for this court to use for determining his own readiness for reentry into the community."

The court also received evidence of the acquittee's past violent behavior, including the offense for which he was prosecuted. The acquittee was charged with

---

[4] It is not clear from the record exactly how long the acquittee persisted in telling people that he was hearing voices or what his motivation may have been for maintaining that alleged deception after he had been committed to the care of the commissioner of mental health and no longer was subjected to the noise of the jail where he had been detained.

the murder of his next-door neighbor on July 5, 1971. According to his statement given shortly after the incident, the acquittee shot his neighbor at close range with a shotgun in the course of an argument between the two men regarding the neighbor's use of fireworks in close proximity to the acquittee's property.[5] According

[5] The acquittee's statement dated July 5, 1971, is contained in the court's file, and that statement recites in pertinent part: "Today, July 5, 1971 we had three friends at the house for a cook out . . . .

"During the afternoon we heard fireworks being shot off on the property next door owned by a Mr. Cassan; however they weren't so close as to cause us any trouble.

"Shortly after 8:30 P.M., four of us were playing cards on the porch located just off the kitchen and [one guest] was sleeping outside on the lawn. I was suddenly startled by a loud blast from outside. I looked out and saw [the guest] getting up and could see that he also was startled. I saw a cloud of smoke rising from the adjoining property close to where [the guest] had been laying. I immediately realized that someone had set off a Cherry Bomb and at that point arose from the game in a fit of anger and went directly to my bedroom where I picked up my shot gun (Bay State Single Shot 410 gauge) which was standing next to my bureau and a box of shot gun shells which were on the floor beside the gun. With the gun and shells, still in a fit of anger, I crossed the living room and went out the front door. At that point a second Cherry Bomb went off. I looked up and saw Michael Cassan, who resides next door with his father. With him were his wife and another fellow and they were standing in the Cassan yard looking at the spot where the bomb had gone off. I called out to Michael Cassan and told him to stop shooting off the fire crackers. I remained on my property and Michael walked toward me, staying on the Cassan property. I told him I didn't care if he shot off fireworks as long as he got in his car and went down the hill. During the conversation I broke open the shotgun and placed a shell in the chamber in plain view of Michael Cassan as well as his wife and friend. During this time Cassan's wife kept telling him to come back. He kept coming toward me however and wound up on a large boulder just above me. He said something about neighbors coming after neighbors with guns. I replied that it was the only thing he understood (Referring to a previous incident when he drove his car over my lawn). He said something and I said 'You're so close to death I can't explain it'. He continued arguing and I repeated, shouting, 'You're so close to death I can't explain it'. He continued his argument and I pulled the trigger holding the gun at hip level and the charge struck Cassan in the chest. He flung his arms across his chest, spun, and fell to the ground in a fetal position.

"His wife then came running toward me, screaming at me, stating that she'd do everything in her power to see that I died. I then said 'Do you want the other barrel', knowing full well that it was a single shot. She stopped

to the testimony and the documents contained in the court file, the acquittee has not been physically violent recently. In fact, it appears that the acquittee has made significant progress in being able to express his feelings of anger and frustration verbally rather than physically. The acquittee's prospects for eventual release are very promising, both psychiatrists indicating that he was responding well to treatment. However, at this time the acquittee still experiences the same problems with the symptoms of his mental illness, which contributed to the acquittee's shooting of his neighbor. The court commented that the acquittee's anger, difficulty dealing responsibly with frustration and his "rigid and inflexible" manner were "disturbingly consistent with the conduct that precipitated the 1971 shooting of the [acquittee's] neighbor over a relatively minor incident."

The testimony of the psychiatrists called by the state supports the court's finding of dangerousness. Scott testified that the acquittee's mental illness presented a significant risk that he would "get himself into something very serious that could result in the injury of someone or himself." Scott further opined that, with a reasonable degree of medical certainty, the acquittee would injure himself or others within six months of his discharge. Johnson testified that, in her opinion, the acquittee was dangerous to others and recommended that his commitment be extended by five years. We recognize that, in reviewing similar cases, our Supreme Court has stated that "[a]lthough psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony."

---

and at that point I went into my house by the front door, placed the gun down inside the door and immediately called the police. . . . I told the officer that answered to send a police car, that I had just shot a man."

(Citations omitted.) *State* v. *Putnoki*, supra, 200 Conn. 221.

The court in the present case accepted the testimony of the state's expert witnesses, the psychiatrists Scott and Johnson. The court found Scott's testimony to be both credible and compelling. The court commented that, because Scott had been involved with the acquittee's treatment for some time and had discovered the brain injury that led to the change in his diagnosis, one might expect Scott "to be the most likely to sing the [acquittee's] praises." Both psychiatrists, however, testified that the acquittee was dangerous. The acquittee did not present any expert testimony to contradict the opinions of the state's witnesses. Rather, he now chooses to attack the facts on which they based their opinions. More specifically, the acquittee focuses on the facts recited by Scott as supporting his opinion.

During his testimony, Scott recited three examples that he believed demonstrated that the acquittee continued to experience difficulty coping with the symptoms of his mental illness such that his release would pose a significant danger to others. Rather than reciting all three examples at length, we will address merely the first one.[6] We have reviewed the acquittee's arguments as to the three examples given by Scott, and we conclude that a common theme runs through those arguments. In addressing the three examples given by Scott, the acquittee argues that the situations described do not demonstrate that he is dangerous. If the court had considered those three situations alone, not in the context of the acquittee's condition, it might have concluded that his behavior was merely erratic or inappropriate. See *Addington* v. *Texas*, 441 U.S. 418,

---

[6] The two other examples given by Scott, which we have not analyzed herein, involved an incident where the acquittee threw food at a fellow patient and the acquittee's pursuit of perceived infringements of patients' rights by staff members.

426–27, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) ("[a]t one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable"). However, those situations must be considered in light of his current mental illness. "Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." (Emphasis in original.) Id., 429. We need look no further than the first example given by Scott to demonstrate how the court's judgment is not clearly erroneous.

The first example given by Scott involved an incident in which the acquittee was denied access to an expressive arts group because he did not have a pass. The acquittee became angry and accused Scott of withholding group treatments in an effort to keep him at the facility.[7] The acquittee argues that his reaction of writ-

---

[7] Scott gave the following testimony on August 24, 2000: "[T]here was a recent experience where he wanted to no longer attend an expressive art group, which is one of the groups that we believe he should be attending. He didn't want to continue because another patient was very problematic to him and while that was quite reasonable, we sat down and talked with him, the therapist and I, and he agreed, again, very reasonably, to continue the group. When he went down to the group, he was denied access to it because he didn't have a pass. And he became furious that they wouldn't let him in, and as a result of that, if I can find my note, he wrote a note that really describes, I think well, the problems in the thought disorder. He wrote, I quote, 'Please show me where it has been said by a court of law, a definition of the right to treatment laws and decisions that I absolutely need to a pass, to go to a treatment modality, when told by my doctor and the therapist, moments before?' You can see by the disconnection in what he wrote how angry he is; he's actually quite capable of writing reasonably well.

"He came back to the unit angry. I saw that, we tried to talk, and what I learned in that conversation was that in fact he was quite angry at me. That he accused me of playing head games with him because of testimony I had given to the board several months earlier. His belief was that I had withheld groups from him with in an effort to keep him longer at the facility. Well, that wasn't the case at all; it was in fact the case that we identified the need for the group, for him to be in that group and that's how we ended

ing a note was a reasonable one. That argument is not disputed. However, the acquittee also argues that, "[w]hile it might be problematic that [the acquittee] thinks a paranoid way when frustrated, it cannot reasonably be concluded from this incident that [the acquittee] presents a danger to himself or others despite being angry and thinking in a paranoid manner." We disagree. As the court noted, those symptoms of anger and paranoia were the same symptoms that resulted in the death of the acquittee's neighbor. The court, far from reaching a conclusion that was clearly erroneous, reasonably could have concluded that because the acquittee's mental illness caused one death and the acquittee is not yet able to control the symptoms of his mental illness, he remains dangerous to others.

The acquittee also argues, citing *State* v. *Jacob*, supra, 69 Conn. App. 678–79, that "both the judiciary and the psychiatric community recognize that future predictions of dangerousness are always difficult and often unreliable." Such a determination of future dangerousness, however, was placed in the hands of the courts by § 17a-593 (c), and the court was required to make that very determination before granting or denying the state's petition. The acquittee ignores the language of the United States Supreme Court in *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976), which we quoted in the very passage of *Jacob* to which he cites: "The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to

up making that recommendation. So, what that describes to you is the fact that while he has an understanding of others, he still falls into the same trap of limiting his thinking at times. That when his frustration increases, he decreases his ability to reason, he decreases the options available to him and he starts to think in a paranoid way."

admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities." Id., 274–75; see also *Addington* v. *Texas*, supra, 441 U.S. 429–30 (recognizing need for expert testimony despite fallibility and lack of certainty of psychiatric diagnosis). In the present case, where the court had before it all possible relevant information about the acquittee, the court was qualified to make the difficult determination regarding the acquittee's future dangerousness. See *Jurek* v. *Texas*, supra, 276. We conclude that the court's finding was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.