STATE OF CONNECTICUT *v.* WILLIAM J. WARREN
(AC 26377)

Schaller, McLachlan and Harper, Js.

Argued September 14, 2006—officially released April 10, 2007

*Richard E. Condon, Jr.*, assistant public defender, for the appellant (acquittee).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The acquittee, William J. Warren, appeals from the judgment of the trial court ordering his continued commitment to the psychiatric security review board (board) pursuant to General Statutes § 17a-593. The acquittee claims that (1) the court did not apply the proper legal principles to the state's petition for an order of continued commitment, (2) the court improperly denied his motion to strike the board's report and (3) the evidence did not support the court's findings. We affirm the judgment of the trial court.

In 1971, the acquittee shot and killed his neighbor during an argument, and the state charged the acquittee with murder in the first degree. After a trial in 1974, a jury found him not guilty by reason of mental disease or defect. The court committed him to the custody of the commissioner of mental health for a period of time not to exceed twenty-five years. On July 1, 1985, by operation of General Statutes § 17a-602, he was committed to the jurisdiction of the board.

Before the acquittee's maximum term of confinement was to expire on May 24, 1999, the state filed a petition for an order for his continued commitment. The acquittee voluntarily extended his commitment until the time of the hearing on the state's petition. On September 20, 2001, the court granted the state's petition, thereby extending the commitment by three years. This court affirmed the judgment in *State* v. *Warren*, 77 Conn. App. 564, 824 A.2d 849, cert. denied, 265 Conn. 907, 831 A.2d 253 (2003).

On March 17, 2004, the state filed another petition for an order for the acquittee's continued commitment. The state represented in the petition that "reasonable cause exists to believe the acquittee remains mentally ill to the extent that his discharge at the expiration of his maximum term of commitment [on September 19, 2004] would constitute a danger to himself or others." The state also submitted a report generated by the board recommending that the court grant the state's petition for an order extending commitment by a term not to exceed five years. At the hearing on the state's petition, the state presented the testimony of Patrick K. Fox, a consulting forensic psychiatrist employed by the department of mental health and addiction services' division of forensic services. Fox testified that in his capacity at Connecticut Valley Hospital, he regularly has evaluated the acquittee's mental status. Fox testified concerning his evaluation of and conclusions

regarding the acquittee's mental status. The state also presented a December 23, 2004 report, prepared by Fox and his colleagues in accordance with General Statutes § 17a-586, concerning the acquittee's mental status. The acquittee presented the testimony of Vladimir Coric, a psychiatrist who performed an independent evaluation of the acquittee's mental status. Coric testified concerning his method of evaluating the acquittee as well as his opinion concerning the acquittee's mental status. The acquittee also presented a "voluntary admission application," signed by him, as evidence that he intended to remain committed voluntarily for some time in the event that the court denied the state's petition. Following a hearing, the court granted the state's petition and continued the acquittee's commitment for a period not to exceed two years. This appeal followed. Additional facts will be set forth as necessary.

I

The acquittee first claims that the court did not apply the proper legal principles to the state's petition. We disagree.

The court made several findings concerning the acquittee's mental status. The court found by clear and convincing evidence that he had psychiatric disabilities that are reflected in the fact that he had "continued difficulty managing his anger," "remains mistrustful and suspicious of the motives of others," and "continues to display [a] chronic, pervasive level [of] irritability and an increased sensitivity to perceive[d] slights." The court found by clear and convincing evidence that he had a mental illness that required inpatient treatment and supervision and that without such treatment and supervision, "he would pose a danger to himself or others."

After the court orally rendered its decision, a transcript of which it subsequently signed and filed in accordance with Practice Book § 64-1, the acquittee asked

the court to articulate, inter alia, whether it applied in its legal analysis "the definition of dangerousness set forth in [General Statutes §] 17a-495 (b) or the definition of dangerousness set forth in [General Statutes §] 17a-580 and *State* v. *March*, 265 Conn. 697, 704–12, 830 A.2d 212 (2003)." The court granted the motion to articulate and stated that it had applied the definition set forth in *March*. The court also stated that the state's burden of proof was the same as the burden of proof in a "civil commitment hearing." The court stated: "[T]he state, for a continued commitment of an acquittee beyond his current definite period of commitment . . . bears the burden to show by clear and convincing evidence that the acquittee is currently mentally ill and a danger to himself or others, or is gravely disabled." The court further stated that the fact that the acquittee was a committed patient at the time of the hearing did not significantly affect its analysis. Rather, the court explained that the observations of the acquittee's conduct, wherever such observations occurred, affected its analysis.

The acquittee claims that the court "erroneously applied the less stringent dangerousness standard set forth in . . . *March* . . . which applies to early discharge hearings." The acquittee claims that, in accordance with *State* v. *Metz*, 230 Conn. 400, 645 A.2d 965 (1994), the court should have applied "the civil commitment dangerousness standard" in this continued commitment proceeding. The issue is one of law, over which this court's review is plenary. See *Moss* v. *Foster*, 96 Conn. App. 369, 375, 900 A.2d 548 (2006).

Our analysis begins with the controlling legislative enactments. General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or mentally retarded to the extent that his discharge at the expiration of his maximum term of commitment would

constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee." " 'Danger to himself or others' includes danger to the property of others . . . ." General Statutes § 17a-580 (5).

We examine the standard of dangerousness set forth in *March*, as the court indicated that it applied this standard in reaching its decision. The acquittee in *March* appealed from the denial of her application, brought under § 17a-593 (a), for discharge from the jurisdiction of the board. *State* v. *March*, supra, 265 Conn. 699. Among the claims raised by the acquittee on appeal was that the court "failed to apply the civil commitment standards for defining mental illness and dangerousness as set forth in General Statutes § 17a-495 in determining whether [she] was a person with 'psychiatric disabilities' who posed 'a danger to herself or others' . . . ." (Citation omitted.) *State* v. *March*, supra, 699–700. The court rejected the claim, holding that the definition of dangerousness codified in § 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies applied. Id., 709. The court stated: "Section 17a-581-2 (a) (6) . . . defines " '[d]anger to self or to others,' " as used in General Statutes § 17a-580 (5), as 'the risk of imminent physical injury to others or self,' including 'the risk of loss or destruction of the property of others.' The defendant's claim that the court should have used the more stringent standard reflected in the definition of dangerousness contained in the civil commitment statute is, therefore, unpersuasive because the regulation approved by our legislature expressly states the manner in which the board must construe dangerousness when deciding whether to grant or deny an acquittee's application for discharge." *State* v. *March*, supra, 709.

By contrast, in *State* v. *Metz*, supra, 230 Conn. 400, the acquittee appealed from the trial court's judgment ordering his continued commitment to the board. The acquittee raised, inter alia, a constitutional challenge to the burden of proof to which the court held the state with regard to its petition for an order of continued commitment under General Statutes § 17a-593 (c). *State* v. *Metz*, supra, 419. In its analysis, our Supreme Court distinguished between two types of proceedings to which § 17a-593 applies, those related to a state's petition for continued commitment and those related to an acquittee's application for discharge from custody. Id., 420–21. The court agreed with the acquittee that it was improper for the trial court to have assigned him the burden of proving that "he is no longer insane or dangerous in proceedings brought [by the state] to renew his commitment after expiration of the maximum term of his initial commitment." Id., 419. The court reasoned that "§ 17a-593 (c) impliedly places a burden on the state to establish the need for continued commitment"; id., 421; while "[§ 17a-593 (f)] expressly requires the *acquittee* to bear the burden of establishing his right to a *discharge* by a preponderance of the evidence before expiration of the maximum period of commitment . . . ." (Emphasis in original.) Id., 420–21.

Finding constitutional merit to the acquittee's claim, the *Metz* court concluded that the "presumption of dangerousness initially accompanying an acquittee" does not continue past the maximum period of commitment authorized by General Statutes § 17a-582 (e) (1) (A). *State* v. *Metz*, supra, 230 Conn. 425. The court further stated: "[W]e conclude that § 17a-593 (c) impliedly imposes the same burden on the state at a hearing for the continued commitment of an acquittee beyond his current definite period of commitment as is imposed in a civil commitment hearing under [General Statutes] § 17a-498 (c); namely, to show by clear and convincing

evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." *State* v. *Metz*, supra, 425.

As a preliminary matter, we disagree with the acquittee here insofar as he argues that *Metz* required the court to apply a standard of dangerousness different from the one defined in *March*. The acquittee makes much of the fact that *March* was an appeal from a trial court's denial of an acquittee's application for discharge from the jurisdiction of the board and that *Metz*, like the present case, was an appeal from a trial court's order of continued commitment. We interpret *March* to stand unambiguously for the proposition that § 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies defines the term "[d]anger to self or to others" as it appears in General Statutes § 17a-580 (5). This was the relevant issue resolved in *State* v. *March*, supra, 265 Conn. 709. Section 17a-580, a definitional section, applies to § 17a-593 (c), the legislative enactment on which the state based its petition for an order of continued confinement in the present case. The fact that § 17a-580 (5) likewise applies to actions concerning an acquittee's application for discharge from the jurisdiction of the board does not, in any way, lessen our reliance on *March* insofar as it defines the statutory term at issue.

The acquittee argues that *Metz* "unequivocally" required the court to apply the civil commitment standard of dangerousness, not the standard of dangerousness defined in *March*. We observe that *Metz* did not address the definition codified in § 17a-580 (5). That issue was resolved in *March*. At issue in *Metz* was the state's burden of proof in continued commitment proceedings, specifically, whether the presumption that an acquittee is dangerous should continue beyond the maximum period of commitment authorized by General Statutes § 17a-582 (e) (1) (A). We disagree with the

acquittee that the court's holding in *Metz*, as relevant, went beyond this narrow issue. The court stated that § 17a-593 (c) imposed the same burden on the state as is imposed in a civil commitment hearing under § 17a-498 (c). Logically, we view the court's reference to civil commitment proceedings in *Metz* in its proper context; the court in *Metz* held that, as is the case in civil commitment proceedings, the presumption of dangerousness does not apply in proceedings for continued commitment. Simply put, we rely on the holding in *March* concerning the proper definition of § 17a-580 (5).

More importantly, to the extent that the acquittee argues that different standards of dangerousness apply to proceedings for continued commitment as opposed to civil commitment proceedings, the Supreme Court has resolved this issue to the contrary in *State* v. *Harris*, 277 Conn. 378, 890 A.2d 559 (2006). In *Harris*, the acquittee appealed from the trial court's granting of the state's petition for an order of continued confinement. Id., 380. Among several issues raised by the acquittee on appeal was that the trial court improperly had denied his motion to strike a report the board submitted to the court. Id. The acquittee claimed that the report was irrelevant and unfairly prejudicial, in part because "the board applied the incorrect legal standard of dangerousness to the acquittee . . . ." Id., 387. Specifically, the acquittee claimed that the board improperly applied the definition of dangerousness set forth in § 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies rather than the definition applicable to civil commitment proceedings that is codified in General Statutes § 17a-495 (b). *State* v. *Harris*, supra, 388. Our Supreme Court rejected the acquittee's claim, holding that there was "no legally significant difference between the definitions of dangerousness employed in board and civil commitment hearings." Id. The court also stated that

the trial court was required to apply the "clear and convincing" burden of proof to the case as a whole. Id.

In the present case, the court stated that it applied the definition of dangerousness approved in *March,* which is based on the definition of dangerousness set forth in § 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies. The court explicitly stated that it required the state to prove its case by "clear and convincing evidence." On the basis of our Supreme Court's rulings in *March* and *Harris,* we conclude that the court applied the proper legal principles in ruling on the state's petition.[1]

## II

The acquittee next raises a multifaceted challenge to the court's denial of his motion to strike the board's report. The state filed the board's report in accordance with General Statutes § 17a-593 (d). As he did before the trial court, the acquittee claims that (1) the report was irrelevant and unduly prejudicial, (2) the report contained inadmissible hearsay, (3) the report constituted inadmissible "testimonial hearsay" in violation of *Crawford* v. *Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and (4) the admission of the report violated his procedural due process right to cross-examine adverse witnesses as well as his right to fundamental fairness. We will address each facet of the acquittee's claim in turn.

---

[1] At oral argument before this court, the acquittee, while acknowledging our Supreme Court's holding in *Harris,* also argued that the fact that the trial court appeared to believe that there was a substantive difference between the definition of dangerousness employed in board and civil commitment proceedings itself suggested that the court misapplied the law. We already have determined that the definition that the court expressly relied on was legally proper. In light of the relevant holding in *Harris,* as well as our review of the court's ruling and subsequent articulation, we are not persuaded by this aspect of the acquittee's claim.

## A

The acquittee first claims that the report was irrelevant and unduly prejudicial. The acquittee argues that, in reaching its recommendation for his continued commitment, the board applied "the less stringent dangerousness standard" set forth in § 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies, which, he argues, did not apply to the state's petition for continued confinement. The acquittee also argues that because the board's primary concern is the protection of society rather than his liberty interest, the board "necessarily undertook a flawed application of the clear and convincing evidence burden of proof" and was biased in favor of his continued commitment.

"It is well established that this court affords great deference to a trial court's evidentiary rulings. . . . The trial court's rulings on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [appellant] of substantial prejudice or injustice. . . .

"A party is entitled to offer any relevant evidence to aid the trier of fact in its determination, as long as the evidence is not unfairly prejudicial. . . . Relevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he

fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible. . . .

"However, relevant evidence may be excluded if the court determines that its probative value is outweighed by the danger of unfair prejudice . . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom it is offered] but whether it will improperly arouse the emotions of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Slade*, 97 Conn. App. 404, 409–10, 905 A.2d 689, cert. denied, 280 Conn. 931, 909 A.2d 959 (2006).

In part I, we held that the court properly applied to the state's petition the definition of dangerousness set forth in the board's regulations. On the basis of that analysis, we likewise conclude that the board properly relied on this same definition in preparing its report concerning the acquittee's mental state and dangerousness. The acquittee has not demonstrated that the board's report was either irrelevant or unduly prejudicial on this ground.

General Statutes § 17a-584 provides in relevant part that the board's "primary concern is the protection of society . . . ." The acquittee argues that because the court's predominant interest under the clear and convincing evidence standard should be his liberty, the board's application of the clear and convincing evidence standard in its report rendered its report irrelevant with regard to the issues before the court. The acquittee also

claims that in light of the board's statutory mandate, the board was biased in favor of his continued commitment and, therefore, the report was unduly prejudicial. Our Supreme Court rejected a similar claim in *State* v. *Harris*, supra, 277 Conn. 389–91, and its analysis is instructive in the present case. Relying on the rationale of *Harris* and our thorough review of the board's report, we conclude that the report was clearly relevant because it contained a comprehensive expert assessment of the acquittee's mental state. See id., 390. Even if we were to assume that the board's report was biased in the manner that the acquittee suggests, we would conclude that such bias did not affect the admissibility of the report but was a matter concerning the weight the fact finder should afford it. See id.

Further, we are not persuaded that the report was unduly prejudicial. "[T]here are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the [party against whom the evidence is offered], having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) Id., 391. The report did not concern distracting side issues or facts likely to arouse improper feelings within the fact finder. Further, because the report was prepared and submitted to the court in accordance with § 17a-593 (d), there is no basis to suspect that the acquittee did not anticipate it at the time of the hearing. The acquittee argues that the report was unduly prejudicial solely because the board's primary interest is the protection of society; this ground does

not lead us to conclude that the report was unduly prejudicial. See id., 392.

B

The acquittee next claims that the court should have granted his motion to strike the report because it contained inadmissible hearsay. The acquittee argues that the report was submitted to prove the truth of the matters asserted within it, namely, that he was mentally ill, that he posed a danger to himself or to others and that in light of the applicable board regulations, his mental state required that the court grant the state's petition for an order of continued commitment. The acquittee argues that no exception to the hearsay rule applies to the report. The acquittee also argues that the report was before the court improperly because it "sets forth a legal conclusion on the ultimate issue that is submitted in the form of documentary evidence."

General Statutes § 17a-581 created the board, an autonomous administrative body within the department of mental health and addiction services. Among the board's statutorily prescribed duties, the board plays a clearly defined role in matters, such as the present case, in which the state petitions the court for an order of continued commitment. General Statutes § 17a-593 (d) provides in relevant part: "The court shall forward . . . any petition for continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the . . . petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report." General Statutes § 17a-593 (f) provides in relevant part: "After receipt of the board's report and any separate examination reports, the court shall

promptly commence a hearing on the . . . petition for continued commitment. . . ."

Although it is by no means required to do so, the court, in its role as finder of fact in matters brought under § 17a-593, may properly credit the board's opinions and rely on its findings. See, e.g., *State* v. *March*, supra, 265 Conn. 712. "[U]nder the acquittee statutory scheme, the board has general and specific familiarity with all acquittees beginning with their initial commitment and, therefore, is better equipped than courts to monitor their commitment. By placing oversight of these individuals in a single administrative agency, such as the board, which is comprised of laypersons and experts in relevant areas, including psychiatry, psychology, probation, and victim advocacy, the legislature reasonably could have believed that the board, with its expertise and familiarity with the mental status of each acquittee, would be better equipped than a court to monitor the individuals' recommitment." *State* v. *Long*, 268 Conn. 508, 536, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

The foregoing authorities reflect that the legislature imposed a duty on the board to submit its report to the court when a petition for continued commitment has been filed by the state. The acquittee challenges the report for containing an assessment of his mental state and a recommendation that the court grant the petition. The board's expert evaluation concerning these matters, however, is precisely what the legislature required the board to provide to the court. The legislature clearly has determined that the board's assessment is significant and necessary to the court's analysis in, among other cases, continued commitment actions. The acquittee has not challenged the validity of the legislative enactment requiring that the board prepare a report and submit it to the court. The report at issue fell within the requirements of this enactment. On the basis of the

evidentiary objection raised, we will not reverse the court's denial of the acquittee's motion to strike.[2]

## C

The acquittee next claims that the board's report was inadmissible because it constituted "testimonial" hearsay under *Crawford* v. *Washington,* supra, 541 U.S. 50–54 (holding that admission of testimonial hearsay in criminal cases violates sixth amendment's confrontation clause unless witness is unavailable and defendant had prior opportunity for cross-examination). The trial court rejected this claim, reasoning that the continued commitment proceeding was "not a criminal proceeding" and, thus, did not implicate the principles enunciated in *Crawford.*

In *State* v. *Harris,* supra, 277 Conn. 392–94, our Supreme Court rejected an acquittee's claim that the admission of a report prepared by the board in a continued commitment proceeding violated the principles of

---

[2] The acquittee also characterizes the report as improper because it "sets forth a legal conclusion on the ultimate issue" that, on the basis of clear and convincing evidence, he has a mental illness that requires inpatient treatment and supervision, and that without such care, he poses a danger to himself or to others. The report was not inadmissible on this ground.

First, General Statutes § 17a-593 (d) requires the board to "[set] forth its findings and conclusions as to whether the acquittee is a person who should be discharged. . . ." This enactment expressly requires the board to submit a legal conclusion to the court. Second, even were this not the case, our rules of evidence do not always prohibit an expert witness from giving an opinion that embraces an ultimate issue. Such an opinion is admissible "where the trier of fact needs expert assistance in deciding the issue." Conn. Code Evid. § 7-3 (a).

Such is the case here; our decisional law characterizes as difficult the task of the trial court in evaluating an acquittee's mental state and evaluating his dangerousness. "It is, of course, not easy to predict future behavior. . . . Predictions of future dangerousness are difficult for both psychiatrists and the courts to make because of the inherent vagueness of the concept itself, and such determinations must be dealt with by trial courts to a considerable extent on a case-by-case basis." (Citation omitted; internal quotation marks omitted.) *State* v. *Jacob,* 69 Conn. App. 666, 678, 798 A.2d 974 (2002).

*Crawford.* The court concluded that "continued commitment proceedings are not criminal prosecutions and, therefore, the confrontation clause of the sixth amendment does not apply and did not preclude the report's admission . . . ." Id., 394. On the basis of the reasoning and holding in *Harris*, we reject the acquittee's claim.

### D

The acquittee also claims that even if sixth amendment protections did not apply to the recommitment proceeding, the admission of the report violated his "procedural due process right of cross-examination and right to fundamental fairness." The acquittee argues that his liberty interest was at stake, that the report contained the opinions of experts who did not testify and who were not subject to cross-examination, and that the expert opinion at issue addressed "the ultimate legal issue" in the proceeding. The state contends that the acquittee was afforded constitutionally adequate due process by means of the procedures used in the proceeding. We agree with the state.

The court rejected the acquittee's procedural due process claim. The issue of whether the admission of the report violated the acquittee's procedural due process rights is a question of law over which this court's review is plenary. See *State* v. *Harris*, supra, 277 Conn. 394.

"[D]ue process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands. . . . The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum. . . .

"The United States Supreme Court [has] set forth three factors [which our Supreme Court has followed] to consider when analyzing whether an individual is

constitutionally entitled to a particular judicial or administrative procedure: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures. . . .

"The fundamental requisite of due process of law is the opportunity to be heard . . . [which] must be at a meaningful time and in a meaningful manner. . . . [T]hese principles require that a [party] have timely and adequate notice detailing the reasons for [the proposed action], and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." (Citations omitted; internal quotation marks omitted.) *State* v. *Harris*, supra, 277 Conn. 395–96.

With regard to the first *Mathews* factor, we recognize that the procedures that governed the acquittee's recommitment affected the acquittee's interest in liberty, a universally recognized and significant private interest. See id., 397; *State* v. *Long*, supra, 268 Conn. 524. With regard to the third *Mathews* factor, we recognize the state has a substantial interest "in confining individuals who, as a result of mental illness, pose a potential danger to themselves or others." *State* v. *Long*, supra, 524. Mindful of these substantial interests, we turn to an analysis of the second *Mathews* factor, asking

whether the procedures used posed a risk of an erroneous deprivation of the acquittee's liberty.

The record reveals that the state initiated this action by filing a petition with the Superior Court for the acquittee's continued commitment. The board thereafter held a conference during which it evaluated the acquittee's mental status in accordance with § 17a-593 (d), which provides in relevant part that the board "may hold a hearing or take other action appropriate to assist it in preparing its report." The report submitted by the board reflects that the board based its opinions on information provided to the board by the acquittee's treatment providers at Connecticut Valley Hospital, where the acquittee is confined. After the board submitted its report, the acquittee's public defender filed notice of his intent to perform a separate examination of the acquittee, as provided for in § 17a-593 (e).

In January, 2005, the court held an evidentiary hearing during which both parties presented evidence. As discussed previously, the state presented testimony from Fox, a board certified forensic psychiatrist who treated the acquittee at Connecticut Valley Hospital, as well as a report prepared by Fox and his colleagues in accordance with § 17a-586. Through his public defender, the acquittee presented the testimony of Coric, the psychiatrist who performed an independent evaluation of the acquittee's mental status. Coric opined that the acquittee was not a danger to himself or to others and that his discharge, while receiving treatment, was advisable. In addition to presenting expert testimony that conflicted with that presented by the state, the record reflects that at the recommitment hearing, the acquittee's public defender both had the opportunity to and did vigorously cross-examine Fox.

Our review of the procedures employed in this case reveals that they did not pose a risk of an erroneous

deprivation of the acquittee's liberty. The board's report was not subject to deferential treatment by the court. See *State* v. *Harris,* supra, 277 Conn. 398. As we held in part I, the court held the state to its proper burden, which was to prove by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or others or that he is gravely disabled. The acquittee availed himself of his opportunity to present to the trial court an independent, and favorable, assessment of his mental status and dangerousness. Further, through his public defender, the acquittee availed himself of his right to cross-examine the state's expert at the recommitment hearing. The procedures used included adequate notice and statutory safeguards. The procedures also permitted the acquittee to be heard and to challenge the state's evidence.

The acquittee argues specifically that his procedural due process rights were violated in that members of the board rendered opinions in the report and "[were] not subject to cross-examination." The acquittee couches his claim in terms of his procedural due process right to cross-examination. Obviously, the acquittee could not, in the customary sense, cross-examine witnesses who were not called to testify by his adversary, the state. In the context of a recommitment hearing, the submission of the board's report is required by statute. The state is not required either to rely on the report in presenting its case or to call the report's authors, the relevant members of the board, to testify. Further, there is no requirement that any of the report's authors be present to testify as to the determinations in the report.[3] As a purely practical matter, procedural

---

[3] In contrast, when a trial court orders a competency evaluation of a criminal defendant, our law requires the examiner or examiners to prepare a written report and submit the report to the court, which causes the report to be delivered to the parties. General Statutes § 54-56d (d). General Statutes § 54-56d (e) further provides in relevant part: "The court shall hold a hearing as to the competency of the defendant no later than ten days after the court receives the written report. Any evidence regarding the defendant's

due process in this context does not entail a right to cross-examine the members of the board if the state does not call such persons to testify. Rather, in this context, procedural due process concerns focus on whether the procedures used afforded the acquittee an opportunity to challenge the content of the report in accordance with our rules of practice.

As we already have discussed, the procedures used afforded the acquittee an opportunity to present to the court an independent assessment of his mental status and dangerousness, thereby challenging the contrary opinions expressed in the report. The state, to some degree, relied on the report, and the acquittee had an opportunity to challenge the evidence presented by the state and an opportunity to cross-examine any witnesses called by the state. The acquittee also had a right to subpoena witnesses, including the members of the board, for the purpose of challenging the facts and opinions set forth in the report or to impeach its authors. See Conn. Code Evid. § 6-4 et seq. The fact that the acquittee did not call any board members to testify reflects a tactical decision on his part rather than the existence of any procedural obstacle that prohibited him from doing so.

Accordingly, we are persuaded that the procedures used in this case adequately diluted any risk of an erroneous deprivation of the acquittee's liberty and that the acquittee was provided with constitutionally adequate procedural due process. In light of the opportunity that

competency, including the written report, may be introduced at the hearing by either the defendant or the state. *If the written report is introduced, at least one of the examiners shall be present to testify as to the determinations in the report . . . .*" (Emphasis added.) As this enactment reflects, the legislature has, in somewhat analogous circumstances, required that the author of a report submitted to the court be present for examination. It has, however, not done so in the context of reports submitted to the court in accordance with General Statutes § 17a-593 (d).

the acquittee had to challenge the matters and opinions contained in the report, which was not unduly prejudicial, we likewise conclude that he also has failed to demonstrate that the admission of the board's report was fundamentally unfair.

## III

Finally, the acquittee claims that the evidence did not support the court's finding by clear and convincing evidence that he was a danger to himself or to others to the extent justifying his continued commitment. We disagree.

The court stated: "[The acquittee] has a continued difficulty managing his anger and remains mistrustful and suspicious of the motives of others. He continues to display [a] chronic, pervasive level [of] irritability and an increased sensitivity to perceive[d] slights. He needs his current structure, treatment and intervention. His axis I personality changes and substance abuse factor and his axis II antisocial personality disorder still exist. Therefore, this court does find, by clear and convincing evidence, that [the acquittee] has a mental illness and continues to require inpatient treatment and supervision for that illness and without [such treatment and supervision] he would pose a danger to himself or others."

"The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *State* v.

*Corr*, 87 Conn. App. 717, 722, 867 A.2d 124, cert. denied, 273 Conn. 929, 873 A.2d 998 (2005).

The acquittee does not appear to challenge the court's findings with regard to the existence or extent of his psychiatric disability. The evidence before the court established the extent of the acquittee's mental illness; Coric, the psychiatrist called to testify by the acquittee, testified that the acquittee has a chronic mental illness that requires lifelong treatment. The acquittee takes issue with the court's finding that his disability causes him to be dangerous to the extent that recommitment is warranted. Specifically, the acquittee argues that the evidence did not reflect that he had engaged in any acts of physical aggression since the time of his first recommitment and that there was evidence that he "can transition into the community over time as a voluntary committee."

The acquittee accurately argues that there was no evidence that he engaged in any acts of physical aggression since the time of his first recommitment. This fact, however, does not detract from the court's assessment of his dangerousness. The court had before it evidence that the acquittee had a long history of mental illness characterized by anger, aggression and paranoia. It is undisputed that these same symptoms, directly related to his incapacity to manage anger, were reflected in the acquittee's conduct in 1971 for which he was acquitted.

The board represented that the acquittee had made "some clinical gains" since the time of his first recommitment and that he was "[a]n active and cooperative participant in treatment groups . . . ." The board also represented that the acquittee acknowledged that alcohol was a factor in his criminal conduct and that he has expressed a commitment to refrain from alcohol or drug use. Both Fox and Coric discussed the fact that the acquittee had made progress in his treatment. The

acquittee has also recognized the need for treatment for his mental illness.

Despite evidence of some progression in the acquittee's treatment, there was overwhelming evidence before the court that the symptoms related to the acquittee's mental illness persisted to a significant degree at the time of the hearing. The board detailed the fact that the acquittee often exhibited "an undertone of suspiciousness and mistrust" toward those with whom he came in contact, as well as the fact that the acquittee frequently "misperceives the intentions of others." The board noted that in response to such events as the sequence in which hospital staff dispenses medications to patients and the type of snacks offered by the hospital dietary service, the acquittee responds angrily in a way that "is typically in excess of that which one would expect from the general population." The board recounted other instances of the acquittee's frequent conflicts with hospital staff over trivial matters. In one instance, the acquittee approached a staff nurse with "his face red" and spoke to her in a loud and angry voice. In another instance, the acquittee accused a nurse of removing a quilt from his bed and thereafter accused hospital staff of conspiring against him. The board cited these incidents as examples of how the acquittee typically misinterprets social cues, mistakenly infers a malicious intent on behalf of other persons and adopts "a persistent stance of being the subject of mistreatment." The board further stated that these instances, which occur regularly, involve the acquittee exhibiting anger as a result of his incapacity to perceive accurately the intentions of others as well as his incapacity to control his angry response, which ranges "from mild irritation to frank rage."

The board represented the following in its report: "[The acquittee's] level of functioning and perceiving

the world around him remains paranoid. His misinterpretation of social situations and the invocation of intentionality into the actions of others where it clearly does not exist remain. [The acquittee's] limited coping mechanisms to deal with these suspicious and paranoid beliefs and limited capacity to modulate the strong emotions that he consequently experiences causes him to remain a risk to others. These distorted beliefs are exactly the same behavioral patterns that led to the crime for which he was acquitted, placing him under the jurisdiction of the [b]oard."

Fox testified that in the absence of the acquittee's current treatment structure, the acquittee remained a danger to himself or to others. Fox testified that instances of the acquittee's frustration and anger have not diminished despite the fact that the acquittee has had an improved capacity to learn to resolve such difficulties on his own. Importantly, Fox testified that there is a continued need for hospital staff to intervene in order to assist the acquittee in halting the progression of his anger. Fox recounted his knowledge of recent incidents in which the acquittee has expressed an unreasonable degree of anger over benign or trivial matters. As Fox testified, during these incidents the acquittee has exhibited "a reddened face, glaring eyes, speaking in a loud tone or pointing his finger such that the people who are witnessing this are describing feeling threatened or concerned." Fox testified that the acquittee required medication and treatment to assist him in recognizing and stopping the escalation of angry feelings. Fox testified that serious questions remained as to whether the acquittee possessed the ability to suppress his anger absent intervention from others and whether it was probable that the acquittee could become violent absent supervision "in the community." Fox further testified that transitioning the acquittee into the community was a necessary goal of hospital staff and that

his caretakers were working on a plan to help him with such a transition at a later date.

"In reaching its difficult decision [as to an acquittee's dangerousness], the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986).

Although the record does not reveal any acts of physical aggression since the time of the acquittee's first recommitment, we conclude that the record reveals that the acquittee continues to exhibit symptoms from which a court could draw the conclusion that he is dangerous to the extent that continued commitment is warranted. "[T]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society." Id., 221. Although expert medical testimony may be helpful to the court, the issue is one to be resolved by the court rather than by medical professionals; the court is called on to evaluate evidence of an acquittee's mental state to distinguish between the potentially dangerous and the harmless individual, giving "priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence." Id., 220–21. There is no bright line test for evaluating dangerousness and predicting an acquittee's future behavior, and our courts have recognized that the definition of dangerousness is "necessarily vague . . . ." (Citations omitted; internal quotation marks omitted.) Id., 219–20.

Here, the court was presented with evidence concerning the acquittee's interactions with others. This evidence demonstrated that the acquittee has significant

problems in perceiving accurately the world around him. These problems typically lead to his exhibiting strong emotions, responses characterized by rage and anger, in response to trivial problems. The acquittee exhibited this type of conduct when he shot and killed a neighbor during a dispute over the neighbor's use of fireworks, the conduct for which he was acquitted.[4] *State* v. *Warren*, supra, 77 Conn. App. 566. The court, mindful of its legal obligation to consider public safety, reasonably concluded that serious questions remained concerning the acquittee's ability to interact with others in a safe and reasonable manner. Specifically, the evidence raised serious questions concerning the acquittee's ability to manage on his own the symptoms of his mental illness, which includes his anger. The evidence demonstrated that the acquittee responds adequately to treatment, specifically, anger management treatment, in the hospital setting. In light of the evidence and expert opinion before the court, however, this fact did not legally or logically require a conclusion that such treatment during a court-imposed term of recommitment was no longer necessary for the acquittee's well-being or to protect society. On the basis of the evidence, the court reasonably concluded that the acquittee posed a danger to himself or to others such that continued commitment was justified.

Further, the acquittee's argument that the evidence reflected that he could transition into the community "over time as a voluntary committee" is not persuasive. Fox testified that it remained a treatment goal that

---

[4] The acquittee argues that the circumstances of his prosecution were "too remote to be probative of future dangerousness." It does not appear that the court afforded considerable weight to the nature of the offense for which the acquittee was prosecuted in assessing his current dangerousness. Nevertheless, an "acquittee's past violent behavior and the nature of the offense of which he was acquitted are not irrelevant factors in determining current dangerousness." *State* v. *Jacob*, 69 Conn. App. 666, 685, 798 A.2d 974 (2002).

the acquittee be transitioned into the community. Fox testified that medical personnel were working with the acquittee, both to assist him in developing strategies to reduce his anger and to develop a plan to place him back into the community while under the monitoring and treatment of the board. Fox did not opine that the acquittee was a person who should be discharged to live in the community. Coric, to the contrary, testified that the acquittee was "ready to be transitioned into the community" in a gradual manner. Coric opined that if the acquittee took his medications and received the appropriate treatment, he would not pose a danger to himself or to others. There also was evidence before the court that the acquittee had signed a voluntary commitment order.

Certainly, the court was free to reject Coric's testimony and reach its own conclusion concerning the acquittee's readiness to be discharged and whether the acquittee posed a danger to himself or to others. Even if we assume arguendo that the acquittee was prepared to remain committed voluntarily for a period of time and that there was *some* chance that he could be transitioned into the community successfully, while receiving treatment for his mental illness, these facts would not have any bearing on the court's reasonable conclusion that he posed a significant danger to himself or to the community such that recommitment was warranted.[5]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] In its ruling, the court noted that Fox and Coric both testified that the acquittee "should be transitionalized into the community," but had different opinions as to when and how that should occur. The court stated that the issue was "the mechanics of how to go about it and [how] to safeguard the community." It is apparent that the court found that the acquittee's mental condition and the symptoms related thereto might improve. The board recommended recommitment for five years, and the court ordered recommitment for two years. The court stated: "I'm hoping that if, in fact, [the acquittee] does come back within two years, at that point in time he will

have reached maximum and optimum improvement in a structured environment and can be transitionalized [into the community]."